[Cite as *State v. Wachee*, 2021-Ohio-2683.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                         No. 110117

        v.                              :

KNEE WACHEE,                            :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 5, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-640498-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney,
and Kerry A. Sowul, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and
Francis Cavallo, Assistant Public Defender, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant Knee Wachee was indicted for aggravated murder, murder, and felonious assault in connection with his wife's death. At the bench trial, the state produced evidence to show that he strangled her to death on

the same day he caught her engaging in sexual conduct with another man. The trial court found him guilty of murder and felonious assault and sentenced him to an indefinite term of 15 years to life. On appeal, Wachee raises the following two assignments of error for our review:

I. There was insufficient evidence produced at trial to support a finding of guilt on any counts.

II. The trial court erred by finding the defendant guilty against the manifest weight of the evidence.

{¶ 2} After a review of the evidence presented by the state, we find no merit to Wachee's claims and affirm the judgment of the trial court.

**Trial**

{¶ 3} The evidence presented at the trial shows that Wachee and his wife Maiya Latimer ("the victim" hereafter) were married in 2018. Their marriage deteriorated, and the couple had discussed divorce. In the morning of May 21, 2019, Wachee caught his wife engaging in sexual conduct with Mylz Reed — who is her best friend Terrion Reed's brother — inside Mylz's vehicle, parked in the garage of the Wachees' apartment building. After they were discovered, Mylz Reed and the victim sped away, hitting another vehicle in the garage. The victim then went to work at the Target store in Richmond Heights, where Terrion also worked. The victim went home in the afternoon after her shift. Terrion became concerned when the victim failed to answer several phone calls from her. The next morning, Terrion asked her family to contact the Richmond Heights police. The police arrived at the

couple's apartment to find the victim's body on the floor in the foyer.  She had been strangled to death.  There was no forced entry into the apartment.

## A.  Testimony of Victim's Boyfriend

{¶ 4} Mylz Reed, Terrion's brother, met the victim in the beginning of 2019. The friendship turned into a sexual relationship.  In the morning of May 21, 2019, he went to pick up the victim from her apartment to drive her to work.  When the two were inside his vehicle parked in the garage of the apartment building, she performed oral sex on him.  While engaging in the sexual conduct, they were startled to see Wachee walking up to the vehicle and screaming her name.  Mylz quickly backed out of the garage, hitting another vehicle in the garage.

{¶ 5} Mylz took the victim to work afterward.  He received a call around noon from the victim, saying her husband called her to tell her the person in the other vehicle struck by Mylz's vehicle earlier was dead and he was picking her up so she could talk to the police.  He did not talk to the victim after that phone call.  He texted her at 7 p.m., asking her what she was up to.  He received no response until 12 a.m., when a message saying "fucking" was sent from her cellphone.

{¶ 6} On cross-examination, Mylz acknowledged that the last location the victim's cellphone "pinged" was in the city of Hudson, where he lives.

## B.  Testimony of Victim's Friend

{¶ 7} Terrion Reed, Mylz's sister, knew the victim before the victim and Wachee were married.  Terrion and the victim were best friends, and they worked together at the Target store.  They constantly communicated by phone calls and text

messages when they were not at work. The victim confided in Terrion about her marital problems with Wachee. A week or two before the victim was killed, she sent Terrion a video in which Wachee was heard saying that if he ever caught her with another man, he would kill her.

{¶ 8} On May 21, 2019, the victim finished her shift around 3:30 p.m. Before she left, she told Terrion to call her three times and to come looking for her if she did not answer.

{¶ 9} Terrion called the victim sometime after the victim left. The victim did not answer. Terrion called again at 11:00 p.m. but again received no answer. Terrion called the victim at 6 a.m. the next morning, and again there was no answer. She became very concerned and used a location sharing app on her cellphone to locate the victim's cellphone and learned her cellphone was at Boston Mills Road.

{¶ 10} Alarmed by the cellphone's location, Terrion contacted her family, who then contacted the Richmond Heights police for a welfare check on the victim. Terrion's sister drove her to the victim's apartment building. The police arrived around the same time, and she was eventually told about the victim's death.

{¶ 11} Terrion also testified that, several months before the victim's death, the victim told her Wachee had choked her. She told Terrion she did not want to be with Wachee anymore but she had to continue to live with him for financial reasons. The victim tried to get a restraining order against Wachee, but was told that she needed proof of physical harm.

## C. Testimony of Defendant's Friend

{¶ 12} Braxton Wright knew Wachee since middle school. They were close friends and talked daily. Wright was aware that the relationship between Wachee and the victim had deteriorated and they both wanted a divorce. Wright advised Wachee to get a divorce and move on.

{¶ 13} On May 21, 2019, Wachee called Wright sometime in the morning to tell him he caught his wife with another man. Concerned with Wachee's anger and what he may do, Wright told Wachee to just leave. Later in the day, Wright received a phone call from Wachee, saying he and his wife got into an argument and he "choked his wife out." Wachee asked Wright to come over to the apartment to help him dispose of the body because it was very heavy. Wachee called him again later, telling him he had thrown away his wife's cellphone and credit card. Wachee also told him his idea of moving the body to a freeway. Wright did not help Wachee with the victim's body but did not call the police either because he was scared. When interviewed by Detective Duffy several days later, he revealed Wachee's phone conversations with him on the day of the victim's death.

## D. Richmond Heights Police

{¶ 14} The state presented seven witnesses involved in the investigation of the homicide. Sergeant Joseph Arbogast was among the first officers who arrived at the scene. The door to the couple's apartment was unlocked, and he found the victim's body on the floor of the foyer as soon as he entered the apartment. There were red marks on her throat. No forced entry into the apartment was found.

## 1. The Investigation

**{¶ 15}** Detective Darren Porter executed a warrant and searched Wachee's vehicle. Inside the vehicle, the police found a backpack containing many items with the victim's name on it, including her debit card and birth certificate.

**{¶ 16}** Detective Charles Duffy, the lead detective in this case, testified that Terrion Reed, using a location sharing app on her phone, "pinged" the victim's cellphone and found the phone's last location to be at Boston Mills Road in Hudson, four miles from The Gardens at Liberty Park in Streetsboro, an assisted living complex where Wachee worked. The location, however, was also close to Mylz Reed's residence. The police searched for the phone but were unable to recover it.

**{¶ 17}** During his interview with Wright, Wright told him he tried everything in his power to persuade Wachee, whom he considered his best friend, to walk away from his marital problems. He was devastated by Wachee killing his wife. Wright also told Detective Duffy about the long phone calls he had with Wachee on the day of the victim's death. On cross-examination, the defense counsel insinuated Wright had engaged in sexual intercourse with the victim on multiple occasions and asked the detective if he was aware of it. Duffy answered no.

## 2. Key Fobs and Surveillance Video

**{¶ 18}** Detective Steve Molle contacted the apartment management and obtained key fob data regarding Wachee's and the victim's key fob usage on May 21, 2019. The data shows the victim used her key fob to enter the garage at 8:03 a.m. At 6:18 p.m., her key fob was used to enter the front door to the lobby of the building,

and that was the last time her key fob was used. Wachee's key fob was used 15 times throughout the day, from 8:41 a.m. until 12:23 a.m.

{¶ 19} Detective Molle also obtained the surveillance video of the apartment building's main entry and matched them with the key fob usages. The video shows the victim entered the lobby of the apartment building at 4:18 p.m., went to the mailroom, and then walked to the elevator. The video also shows Wachee entered the building and walked towards the center stairwell soon after, at 4:35 p.m.

{¶ 20} At 6:36 p.m., the video shows Wachee came from the center stairwell to the main exit of the building, carrying a clear plastic bag. Between 6:36 p.m. and 6:58 p.m., he was seen multiple times on the video coming in and out of the building carrying plastic bags. The last time he was seen on the video was 12:23 a.m., when he used his key fob to enter the garage from the lobby.

### 3. DNA

{¶ 21} The DNA evidence was inconclusive. Forensic DNA analyst Christine Scott testified that she analyzed swabs from under the victim's fingernails and from the back of her neck, as well as swabs from Wachee and Mylz Reed. The DNA profiles from under the victim's fingernails are mixtures, and the foreign DNA in these mixtures is inclusive due to insufficient information.

{¶ 22} The partial "Y-STR" DNA profile obtained from the victim's neck swab is a mixture of major and minor components, and Wachee or his male relatives cannot be excluded as the source of the major "Y-STR" DNA component; Mylz Reed

was excluded as the source of the major "Y-STR" DNA. The minor "Y-STR" DNA component was inconclusive due to insufficient information.

### 4. Cellphone Messages and Search History

{¶ 23} FBI Special Agent Andrew Burke assisted in the investigation of the homicide. To analyze Wachee's cellphone, which Wachee turned into the police, Burke utilized a special software program called "Cellebrite," which can recover deleted text messages as well as the search history in the cellphone's browser.

{¶ 24} At 8:08 a.m. on May 21, 2019, a text message from Wachee to the victim said "come out the car." At 8:11 a.m., a text message from him to her said "[a]ll your shit is going out the house." Wachee then made several calls to the victim's phone. At 8:14 a.m., he texted her to say "[t]alk to me" and "[a]ll your shit is gone." Multiple calls were then made to Terrion Reed and then to the victim again. At 8:46 a.m., his text message to her said "the police is [here] the car crash." During an exchange of text messages, Wachee asked the victim how long the affair was going on and how many men was she involved with, and the victim asked him if he had a gun.

{¶ 25} Wachee then received a text message from Braxton Wright asking "[w]hat happen," followed by several phone calls from Wachee to Wright. Around 12:42 p.m., there was a message from Wachee to the victim saying "[w]ould you please help me pack up my stuff after work I'm already getting started have a lot of stuff to put in my car & we can split up the material thing too," to which the victim

responded "okay." In the early afternoon, there were long phone calls between Wachee and Wright.

{¶ 26} At 4:44 p.m., Wachee's cellphone shows a Google search "Homeless shelters near me." At 5:05 p.m., 5:10 p.m., and 5:16 p.m., Wright called Wachee but there was no response. Wright then sent text messages to Wachee, asking "[w]hat happen" at 5:25 p.m. and again 5:48 p.m. At 5:53 p.m., there was a long phone call from Wachee to Wright, lasting 3 hours and 26 minutes.

{¶ 27} At 8:47 p.m., Wachee's cellphone shows searches for "open forest near me." Between 10:30 p.m. and 10:36 p.m., Wachee made two short phone calls to Wright. At 10:44 p.m., there was a Google search for The Gardens at Liberty Park, which is the name of the assisted living complex where Wachee worked, four miles from where the victim's cellphone last "pinged."

{¶ 28} At 10:45 p.m., Wright sent Wachee a text message saying "[o]kay I call you at 10:55 I got you bro." The message was followed by more phone calls between Wright and Wachee.

{¶ 29} Beginning at 11:38 p.m., Wachee's cellphone shows a series of Google searches: "How to get [rid] of a dead body," "How to carry a dead body," "Bleach on a dead body," "How to get rid of DNA off a dead body," "How to dispose of a dead body without any trace," and "Choking someone out dead body." The search history also reflects an inquiry for how to get away with murder by using a detergent.

{¶ 30} There were then several phone calls to Wright, which went unanswered, and messages to Wright saying "You sleep" and "Call me." After 5 a.m.,

there were text messages from Wachee to his mother "Mom can you hold me" and "I'm coming home I'm very sad," followed by short phone calls to his mother and Wright. At 10:06 a.m., there was a Google search "When does a dead body start to smell" and at 12:38 p.m., a search for "[c]an police tell how long a body has been dead." At 6:59 p.m. there were searches for "[e]vidence of a dead body," followed by "[m]arks on the neck after death" and "[d]eleted text messages police."

**Verdict and Appeal**

{¶ 31} After the bench trial, the trial court found Wachee not guilty of aggravated murder but guilty of murder and felonious assault, and sentenced him to an indefinite term of 15 years to life for his offenses. Wachee now appeals, arguing his convictions were not supported by sufficient evidence and were against the manifest weigh of the evidence. We address these two claims together.

**Standard of Review for Sufficient Evidence and Manifest Weight**

{¶ 32} When reviewing a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed,

but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 33} While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. *Id.* Unlike a claim that the evidence is insufficient to support a conviction, which raises a question of law, manifest-weight challenges raise factual issues. When a defendant argues his or her conviction is against the manifest weight of the evidence, the court

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**Circumstantial Evidence**

{¶ 34} Wachee claims the state produced insufficient evidence to prove he killed his wife and also his convictions were against the manifest weight of the evidence. He argues there was no direct evidence such as eyewitnesses and conclusive DNA evidence; Mylz Reed and Braxton Wright were biased and not credible; and the search history on his cellphone only reflects that he was present

with her body and is consistent with "a man struggling to process and deal with his wife's murder."

{¶ 35} While there was no direct evidence such as witnesses or conclusive DNA evidence linking Wachee to the victim's murder, our review of the trial transcript indicates that the state produced overwhelming circumstantial evidence implicating Wachee in the victim's death.

{¶ 36} Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. In contrast, circumstantial evidence requires "the drawing of inferences that are reasonably permitted by the evidence." *Id.* "Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." *State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37.

{¶ 37} "Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence — circumstantial evidence carries the same weight as direct evidence." *Cassano* at ¶ 13, citing *State v. Treesh*, 90 Ohio St.3d 460, 485, N.E.2d 749 (2001).

{¶ 38} Circumstantial evidence and direct evidence inherently possess the same probative value. *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus. "'Circumstantial evidence is not only sufficient, but may also be

more certain, satisfying, and persuasive than direct evidence.'" *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, ¶ 9, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). Accordingly, "[a] conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 154-55, 529 N.E.2d 1236 (1988). "'[C]ircumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 75, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990). Like any fact, the state can prove the identity of the perpetrator by either circumstantial or direct evidence. *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 15.

{¶ 39} The circumstantial evidence proving Wachee's guilt is overwhelming. The state produced evidence that Wachee discovered his wife engaging in sexual conduct with Mylz Reed in the morning of May 21, 2019. She went home after work and entered the apartment building at 4:18 p.m., and phone calls to her went unanswered after that. Wachee entered the apartment building at 4:35 p.m. and was in and out of the apartment building until sometime after midnight. Shortly before midnight, he started to search the Internet looking for ideas for eliminating evidence from a dead body and for disposing of a body. The next morning, the police found the victim strangled to death in their apartment. In addition, the state

presented the testimony of Wright, who testified that Wachee told him he had "choked his wife out" and asked him to help dispose of the body.

{¶ 40} The evidence presented by the state is simply too incriminating to be the product of mere coincidences. The substantial circumstantial evidence, viewed in a light most in the state's favor, would convince the average mind of Wachee's guilt beyond a reasonable doubt. Wachee's claim that the state produced insufficient evidence to prove his guilt is without merit.

{¶ 41} Regarding his manifest-weight claim, Wachee challenges Mylz Reed's and Braxton Wright's credibility. Their testimony, however, is well corroborated by the call history, text messages, and Google search history found in Wachee's cellphone. This is not a case where the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." Wachee's claim that his convictions were against the manifest weight of the evidence is also without merit. The first and second assignments of error are overruled.

{¶ 42} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN A. GALLAGHER, P.J., and
EILEEN T. GALLAGHER, J., CONCUR