[Cite as *State v. Jones*, 2022-Ohio-2270.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

STATE OF OHIO,                                  :

     Plaintiff-Appellee,                :

     v.                                 :

JAVIER JONES,                                   :

     Defendant-Appellant.               :

No. 110840

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 30, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-642458-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey Schnatter, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Francis Cavallo, Assistant Public Defender, *for appellant*.

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Javier Jones ("Jones"), appeals his convictions for attempted murder, felonious assault, and having weapons while under disability. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} In August 2019, Jones was charged in a 14-count indictment. Counts 1, 4, 7, 9, and 11 charged him with attempted murder in violation of R.C. 2923.02 and 2903.02(A), a first-degree felony. Counts 2 and 5 charged him with felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony. Counts 3, 6, 8, 10, and 12 charged him with felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony. Count 13 charged him with improperly discharging a firearm into a habitation in violation of R.C. 2923.161(A)(1), a second-degree felony. Count 14 charged him with having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony. Each of the counts carried one-year, three-year, and 54-month firearm specifications.[1]

{¶ 3} The matter proceeded to a jury trial in June 2021, at which the following relevant evidence was adduced.

{¶ 4} On May 18, 2019, a group of relatives and friends that included M.Z.B., M.L.B., K.R., R.M., S.R., F.J., and M.L. ("victims"), were hanging out on the porch of M.Z.B. and M.L.B.'s apartment ("Apartment F") in the King Kennedy housing complex ("King Kennedy"). M.L.B. testified that he and his brother M.Z.B. had moved to King Kennedy from the Garden Valley housing complex ("Garden Valley") a year and a half before the incident and that residents of King Kennedy and

---

[1] On June 14, 2021, the state deleted the 54-month firearm specifications from all of the counts and the one- and three-year firearm specifications from Count 14. Jones elected to have Count 14 tried to the jury based on a stipulated jury instruction that Jones "ha[d] been adjudicated a delinquent child for the commission of an offense that prevents him from legally possessing a firearm."

Garden Valley share a mutual dislike for each other. M.L.B. testified that while the victims were standing on the porch of Apartment F, a group of young men approached them and stated that the victims should not be outside. R.M. testified that one person in this group, known as "Frank" and later identified as Jones, began arguing with M.L.B. and threatened R.M. with "gun violence." M.L.B. testified that he saw a gun in Jones's waistband. M.L.B. and R.M. both testified that Jones stood about six to eight feet from the porch, and when the victims refused to go inside, Jones and his group left the area.

{¶ 5} R.M. testified that the victims then walked to the local recreation center, where they spent the rest of the day, and returned to the porch of Apartment F after dark. M.L.B.'s testimony differed from R.M.'s testimony on this point. M.L.B. recalled that the victims had not spent the day at the recreation center. R.M. testified that as the victims stood on the porch, he observed Jones walk by and then return to the area with two young men. R.M. testified that he observed Jones put on a black hoodie and circle behind another apartment building ("Apartment G") located about 60 feet across a courtyard from Apartment F. The porches of Apartments F and G face each other. M.L.B testified that he saw Jones "peeping" on them from the corner of Apartment G and, suspecting that shooting was imminent, tried to push the victims from the porch into Apartment F. R.M. testified that he observed Jones emerge from the corner of Apartment G and begin shooting at the victims. M.L.B. testified that K.R. was shot in the leg. K.R. sustained a femoral fracture from this gunshot wound. M.L.B. testified that his brother M.Z.B. fell where

he stood on the porch, having been shot in the head. M.Z.B. was still on life support at the time of trial.

{¶ 6} Patrol officers Samuel Pelsnik ("Officer Pelsnik") and John Foster ("Officer Foster") testified that they were the first officers from the Cleveland Police Department to respond to the shooting and observed that officers from the Cleveland Metropolitan Housing Authority ("CMHA") were already on scene. The officers described that they encountered a lot of commotion when they arrived, with many King Kennedy residents standing outside screaming and crying. Officers Pelsnik and Foster testified that the officers struggled to get information while interviewing witnesses. They learned some information, but witnesses refused to give their names. Officer Pelsnik attributed their reluctance to fear of reprisals if they were seen giving information to the police.

{¶ 7} Cleveland Police Detective Mark Peoples ("Detective Peoples") testified that 19 officers initially responded to the scene. Detective Peoples testified that the police recovered four spent shell casings from where Jones was spotted firing near the porch of Apartment G but found no bullet holes in Apartment F. Officer Pelsnik testified that one of the victims, F.J., stated that Jones had fired two shots into the air. R.M. testified that he had named "Frank" as the shooter to one of the officers on the scene. The name "Frank," however, did not appear in any police reports. R.M. testified that after he arrived at Rainbow Babies and Children's Hospital ("UH"), where M.Z.B. had been transported following the shooting, R.M. informed A.H., M.Z.B. and M.L.B.'s mother, that Frank was the shooter. A.H.

testified that she also received social media images from several people purporting to identify "Frank." A.H. testified that she sent these images to Cleveland Police Detective John Vinson ("Detective Vinson"), who had been assigned to investigate the shooting.

{¶ 8} Detective Vinson testified that he circulated these photos among Cleveland police detectives and CMHA police, and one CMHA officer who regularly worked the King Kennedy area identified "Frank" as Jones. Vinson testified that he arranged a photo array to be blindly administered to R.M. at UH two weeks following the shooting and R.M. positively identified Jones as the shooter, writing alongside this identification that he was 100% certain. R.M. also testified that he was certain Jones was the shooter. Vinson testified that, after repeated attempts to meet with M.L.B. following the shooting, he was finally able to arrange a photo array to be blindly administered to M.L.B. a year and four months later, and M.L.B. positively identified Jones as the shooter. During his testimony, M.L.B. explained that his delay in identifying Jones as the shooter was that he needed time to process that his brother M.Z.B. was shot and he feared retaliation from Jones.

{¶ 9} A.H. testified that during trial, she received pictures posted to social media showing R.M. on the witness stand with an image of a rat crossed out and a statement that people were going to get "hurt." A.H. also testified that just before she took the witness stand, she received an Instagram photo depicting Jones and captioned "Free Frank" ("'Free Frank' photo"). The trial court permitted the "Free Frank" photo to be shown to the jury but voir dired each juror to ensure that the

threats would be considered solely for witnesses credibility; that each juror understood Jones took no part in producing the "Free Frank" photo or in causing this photo to be produced; and that the photo could be used only for the purpose of identification – that a member of the public who attended the trial believed Jones was named "Frank." The trial court removed the person who took the photo and reiterated that cellphones were not permitted in the courtroom. The trial court also gave the state and defense an opportunity to voir dire each juror, after which trial resumed. Jurors were initially concerned that the photos had also shown the jury, but the trial court reassured each juror that no images were found depicting the jurors. Counsel for Jones moved for a mistrial based on the admitted testimony about the threats as well as the "Free Frank" photo. The trial court denied the motion.

{¶ 10} At the close of the evidence, the state moved to dismiss Counts 7-13 of the indictment, and Count 14 was renumbered as Count 7. The jury was instructed and began deliberating in the late afternoon of June 21, 2021. On June 23, Juror No. 6 requested to step down as jury foreperson, and the jury elected Juror No. 11 to replace her. The next day, Juror No. 11 arrived to court early to share with the jury bailiff that Juror No. 4 had been acting aggressively toward other jurors, especially Juror No. 6 while she was trying to facilitate discussion, and was not giving the other jurors an opportunity to express their opinions. Later that same morning, Juror No. 11 sent the following question to the judge through the jury bailiff: "What happens if the jury can't reach a unanimous decision?"

{¶ 11} The trial court considered a *Howard* charge,[2] but after discussing the matter with the parties, chose to suspend deliberations and question several jurors on the record to learn more about the complaint concerning Juror No. 4. The trial court also permitted the parties to question the jurors. The trial court first questioned Juror No. 11, asking him to relate his complaint about Juror No. 4 and advising him not to disclose the status of the deliberations. Juror No. 11 stated that Juror No. 4's behavior forced them to discontinue deliberating on June 22, because Juror No. 4 and the former foreperson, Juror No. 6, had started shouting at each other, after which Juror No. 11 noticed that Juror No. 4's lip was quivering and his eyes were watering. Juror No. 11 also stated that in the afternoon of June 23, Juror No. 4 continued to talk over other jurors and ignored Juror No. 6's attempts to facilitate discussion. Some of the other jurors asked Juror No. 4 to be quiet and let the other jurors speak. Juror No. 4 replied, "Come over here and make me shut up." Afterward, Juror No. 6 said she could no longer serve as foreperson. Juror No. 11 noted that Juror No. 4 was telling stories about the 2012 shootings at Chardon High School, where he witnessed one of his good friends get killed. Juror No. 11 stated that he had been elected the new foreperson based on how Juror No. 4's behavior escalated from day to day. When asked if complaints about Juror No. 4 had anything

---

[2] *See State v. Howard*, 42 Ohio St.3d 18, 24, 537 N.E.2d 188 (1989). A *Howard* charge reminds deadlocked jurors that their duty is to decide the case if they can conscientiously do so. *Jones v. Cleveland Clinic Found.*, 161 Ohio St.3d 337, 2020-Ohio-3780, 163 N.E.3d 501, ¶ 25, citing *Ohio Jury Instructions*, CV Section 319.07 (Rev. Feb. 25, 2012). The charge challenges the jury to try a final time to reach consensus. *Id.*, citing *State v. Robb*, 88 Ohio St.3d 59, 81, 2000-Ohio-275, 723 N.E.2d 1019 (2000).

to do with removing barriers to a unanimous decision, Juror No. 11 stated that the issue stemmed from Juror No. 4's behavior, not his position on the case.

{¶ 12} The trial court then questioned Juror No. 4, who admitted that several jurors were yelling at each other. The trial court removed Juror No. 4 to a separate room and questioned Juror No. 6, cautioning her not to reveal anything about the deliberations. Juror No. 6 stated that Juror No. 4 was monopolizing discussion, became agitated whenever she tried to keep him on point, and refused to follow turn-taking strategies (such as passing a ball or raising hands) that the jurors had agreed to use to make their deliberations orderly and respectful. Juror No. 6 recalled that Juror No. 4 had initially offered to serve as foreperson and reluctantly agreed to Juror No. 6's serving in that role. Juror No. 6 said she decided to step down because of the personality conflict between her and Juror No. 4, which was impeding the jury's progress. Juror No. 6 added that the issue had nothing to do with Juror No. 4's position on the issues of the case, but rather his manner of engaging in deliberations was causing others to disengage.

{¶ 13} After this colloquy, the trial court resolved to remove Juror No. 4 and replace him with an alternate. The parties agreed to his removal. After his removal, Juror No. 4 threatened to expose the deliberations to the public. The trial court reminded Juror No. 4 of the direction not to disclose the deliberations' substance and advised him that he could be held in contempt if he did so. Juror No. 4 agreed not to disclose and was subsequently removed. Deliberations began anew with the alternate juror.

{¶ 14} The following day, June 25, 2021, the jury reached a guilty verdict on Counts 1-7 and their accompanying specifications. The state elected to proceed to sentencing on Counts 1 and 4. Counts 2 and 3 merged with Count 1, and Counts 5 and 6 merged with Count 4. The trial court advised that a presentence investigation report was ordered but delayed by the probation department because Jones had another case pending before the court. Jones elected to proceed to sentencing without the presentence investigation report. When given a chance to address the court, Jones professed his innocence and raised concerns about the "Free Frank" photo admitted at trial, the trial court's removal of Juror No. 4, and K.R.'s failure to appear at trial.[3] The trial court sentenced Jones to 6 years on the firearm specifications associated with Counts 1 and 4, to be served consecutively and prior to an indefinite sentence of 10-15 years pursuant to the Reagan Tokes Law on the underlying attempted murder charge in Count 1, a consecutive term of 5 years on the attempted murder charge in Count 4, and a concurrent term of 36 months for having weapons while under disability in Count 7.[4] The trial court advised Jones that he was subject to a mandatory 5-year term of postrelease control and credited him with 763 days of jail time. After consulting with the parties, the trial court decided that the procedure for determining whether Jones must register as a violent offender was improperly handled and therefore dismissed that requirement.

---

[3] M.L.B. and R.M. were the only two victims to testify at trial. At the time of the trial, M.Z.B. remained on life support, a material witness warrant had been issued for K.R. but K.R. never appeared, F.J. was deceased, and the remaining victims refused to testify.

[4] Counsel for Jones had objected to the Reagan Tokes advisement at his arraignment.

**{¶ 15}** Jones now appeals this judgment, raising four assignments of error for review:

> Assignment of Error I: Mr. Jones's convictions were against the manifest weight of the evidence.
>
> Assignment of Error II: The trial court denied Mr. [Jones] the right to fair trial by admitting numerous pieces of irrelevant and unfairly prejudicial evidence of witness intimidation that was not connected to him in any way.
>
> Assignment of Error III: The trial court abused its discretion and denied Mr. [Jones] the right to fair trial by improperly removing a seated juror during deliberations.
>
> Assignment of Error IV: The trial court imposed an unconstitutional sentence under SB 201 in violation of appellant's rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S Constitution and Section I of the Ohio Constitution.

## II. Law and Analysis

### A. Weight of the Evidence

**{¶ 16}** In his first assignment of error, Jones argues that his convictions are against the manifest weight of the evidence because the state produced no physical evidence tying Jones to the shooting and R.M., the state's primary identification witness, offered testimony that was inconsistent with M.L.B.'s testimony and the testimony of the Cleveland police officers and detectives. The state argues that two witnesses separately identified Jones as the shooter, and the absence of physical evidence and minor inconsistencies in the witnesses' testimony do not render the convictions against the manifest weight of the evidence.

**{¶ 17}** A challenge to the weight of the evidence questions whether the state has met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266,

2009-Ohio-3598, ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). "'[W]eight of the evidence involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *Thompkins* at 387. "Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's?" *State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. The reviewing court must consider all the evidence in the record, all reasonable inferences therefrom, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 18} Jones first argues that there was no physical evidence tying him to the crime. This court has repeatedly held, however, that "'a lack of physical evidence, standing alone, does not render a defendant's conviction against the manifest weight of the evidence.'" *State v. Johnson*, 8th Dist. Cuyahoga No. 109041, 2020-Ohio-5255, ¶ 78, quoting *State v. Robertson*, 8th Dist. Cuyahoga No. 106279, 2018-Ohio-2934, ¶ 32; *State v. Payne*, 8th Dist. Cuyahoga No. 105965, 2018-Ohio-1399, ¶ 30.

{¶ 19} Jones also argues that although the shooter was alleged to have worn a black hoodie and used a particular handgun, neither the hoodie nor the handgun was ever recovered, and no forensic evidence or circumstantial evidence connects Jones to the shooting.

{¶ 20} "Direct evidence exists when 'a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish.'" *State v. Wachee*, 8th Dist. Cuyahoga No. 110117, 2021-Ohio-2683, ¶ 36, quoting *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Conversely, "circumstantial evidence requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *Id.*, quoting *id.* "'Circumstantial evidence is proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.'" *Id.*, quoting *State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37. "Like any fact, the state can prove the identity of the perpetrator by either circumstantial or direct evidence." *Id.* at ¶ 38, citing *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 15. "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 Ohio St.3d 259, 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶ 21} Here, the state offered both direct and circumstantial evidence that Jones was the shooter. R.M. and M.L.B. both testified that Jones had confronted and threatened them several hours before the shooting. R.M. testified that Jones

approached them, began arguing with M.L.B., and threatened R.M. with "gun violence." M.L.B. testified that he observed a gun in Jones's waistband. Both R.M. and M.L.B. testified that Jones returned later that night, circled and emerged from the corner of Apartment G, and began shooting at them from the porch area of Apartment G. Four spent shell casings were recovered from this area. One bullet struck M.Z.B. in the head. Another bullet struck K.R in the leg. Officer Pelsnik testified that one of the victims, F.J., stated that Jones had fired two shots into the air.

{¶ 22} Through this testimony, the state presented direct evidence that Jones was the shooter and fired at least two shots at the victims. Using the four spent shell casings recovered from the scene, the state presented circumstantial evidence showing approximately where Jones was standing when he fired upon the victims. That the police recovered only two bullets from the victims corroborates Officer Pelsnik's testimony that one of the victims, F.J., who was deceased at the time of trial, stated that Jones had fired two shots into the air. Even though the police did not recover the black hoodie or the gun, the state presented not only direct evidence that Jones was the shooter, but also circumstantial evidence of how the shooting unfolded.

{¶ 23} Jones next argues that R.M., the state's primary identification witness, offered inconsistent testimony. Jones contends that R.M.'s testimony that the victims had returned to Apartment F from the recreation center shortly before

the shooting conflicted with M.L.B.'s testimony that they were not at the recreation center that evening.

{¶ 24} At trial, Jones attempted to impeach R.M.'s testimony with testimony of a recreation-center employee who would testify to the recreation center's hours of operation on the day of the shooting. During the proffered testimony, this witness stated that while the recreation center was closed well before dark, people from the community were not prohibited from visiting the recreation center's grounds. The trial court rejected Jones's attempt to impeach R.M. Based on this proffer, it is not entirely clear from the record that R.M.'s and M.L.B.'s testimony is inconsistent because R.M.'s testimony that the victims had visited the recreation center could mean that they had visited the location surrounding the recreation center, and M.L.B.'s testimony that they had not visited the recreation center could mean that the victims had not gone inside the recreation center. This distinction was never clarified at trial.

{¶ 25} Also, the alleged inconsistency concerning whether the victims were at the recreation center before returning to the porch of Apartment F, where the shooting occurred, involves a collateral matter that is inconsequential in answering the central question of whether Jones was the shooter. *See State v. Beatty*, 8th Dist. Cuyahoga No. 54431, 1988 Ohio App. LEXIS 4706, 13-14 (Dec. 1, 1988) (collateral issues receive less weight). In contrast to this collateral matter, R.M.'s and M.L.B.'s testimony is consistent concerning more essential matters, such as Jones's actions on the day of the shooting and Jones's identity as the shooter. R.M. and M.L.B. both

testified that Jones confronted them as they stood with the other victims on the porch of Apartment F; that Jones carried a gun and stood six to eight feet away when he threatened them; and that Jones returned to the area later in the day, emerged from the corner of Apartment G, and began shooting at them.

{¶ 26} Jones also maintains that R.M.'s testimony that he related Frank's name to the police on the night of the shooting conflicts with police reports and testimony that the police received no information about the shooter's identity that night. Officers Pelsnik and Foster, however, both testified to the commotion they witnessed when they arrived at King Kennedy following the shooting. The officers stated that people were shouting and crying. The officers also testified that people were fearful of being seen talking to police and withheld identifying information. It is not surprising under these circumstances that if the name "Frank" were raised, it might not have made it into a police report. Also, R.M. testified that he informed A.H. of Frank's name at the hospital later that night, and shortly after, A.H. relayed this information, as well as social-media photos identifying Frank as Jones, to Detective Vinson.

{¶ 27} The inconsistencies Jones raises do not undermine R.M.'s credibility enough to overcome R.M.'s and M.L.B.'s separate identifications of Jones as the shooter. Nor do these inconsistencies establish that the jury clearly lost its way in finding that Jones was the shooter. *See State v. Patterson*, 2017-Ohio-8318, 99 N.E.3d 970, ¶ 19 (8th Dist.), quoting *State v. Phillips*, 8th Dist. Cuyahoga No. 103325, 2017-Ohio-1284, ¶ 33, quoting *State v. Hill*, 8th Dist. Cuyahoga No. 99819,

2014-Ohio-387 ("'"[a] conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony"'").

{¶ 28} Therefore, Jones's first assignment of error is overruled.

## B. Witness-Intimidation Evidence

{¶ 29} In his second assignment of error, Jones argues that the trial court deprived him of a fair trial by admitting evidence of witness intimidation as well as the "Free Frank" photo. Jones contends that the trial court improperly relied on *State v. Grimes*, 1st Dist. Hamilton No. C-030922, 2005-Ohio-203, to support admission of this evidence. Specifically, Jones contends that *Grimes* stands for the proposition that evidence of witness intimidation unconnected to the defendant can still be admitted to bolster witnesses' credibility by explaining why these witnesses' stories have changed or why they did not immediately come forward with information about the crime. Jones maintains that admitting testimony about threats in the instant case inverts the usual causal analysis for witness intimidation because, here, that evidence surfaced inside the courtroom and during trial, not outside the courtroom and before trial, which is usually the time when threats cause witnesses to change their stories or withhold information. Jones distinguishes the instant case because R.M. and A.H. never changed their stories, and R.M. immediately identified Jones as the shooter. Jones argues that the trial court erred in denying his motion for a mistrial based on the admitted evidence. The state argues that the evidence was offered to support the witnesses' credibility and show

that Jones was known as "Frank" to at least one other person than the state's witnesses.

{¶ 30} A trial court has broad discretion to grant or deny a motion for a mistrial and will not be reversed on appeal absent an abuse of discretion. *State v. Shine*, 2018-Ohio-1972, 113 N.E.3d 160, ¶ 43 (8th Dist.), citing *State v. Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001), citing *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). "A mistrial should not be declared in a criminal case merely because some error or irregularity has occurred unless the substantial rights of the accused or the state have been adversely affected." *State v. Smith*, 8th Dist. Cuyahoga No. 70855, 1997 Ohio App. LEXIS 3760, 40 (Aug. 21, 1997).

{¶ 31} A trial court also has broad discretion concerning the admission of evidence. *State v. Harris*, 8th Dist. Cuyahoga No. 102855, 2016-Ohio-391, ¶ 14, citing *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175.

> "The decision whether to admit or exclude evidence is subject to review under an abuse of discretion standard, and absent a clear showing that a trial court abused its discretion in a manner that materially prejudices a party, an appellate court will not disturb an evidentiary ruling. An abuse of discretion connotes more than an error in law or judgment, but instead demonstrates perversity of will, passion, prejudice, partiality, or moral delinquency. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court."

*Id.*, quoting *Pappas v. Ippolito*, 177 Ohio App.3d 625, 2008-Ohio-3976, 895 N.E.2d 610, ¶ 19 (8th Dist.).

{¶ 32} Testimony that a witness fears reprisal for testifying is admissible because it is relevant to the witness's credibility. *State v. Payne*, 8th Dist. Cuyahoga

No. 107825, 2019-Ohio-4158, ¶ 52. "This rule applies equally to third-party intimidation that renders a witness reluctant to testify[.]" *State v. Gibson*, 8th Dist. Cuyahoga No. 103958, 2016-Ohio-7778, ¶ 14, citing *People v. Mendoza*, 52 Cal.4th 1056, 132 Cal.Rptr.3d 808, 263 P.3d 1 (2011) ("[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible").

{¶ 33} Here, Officers Pelsnik and Foster testified that they struggled to obtain information from King Kennedy residents due in part to their fear of reprisals if they were seen cooperating with the police. M.L.B. testified that despite Detective Vinson's repeated attempts to schedule an interview so that he could identify the shooter, M.L.B. delayed this meeting for a year and four months due in part to his fear of retribution. Before testifying, A.H. had expressed repeated concerns to the assistant prosecutor that she feared for her and M.L.B.'s safety and had even considered leaving the courthouse before testifying. She stated that shortly before she testified, she received threats and concerning images forwarded to her by M.L., who, along with several other witnesses, was present during the shooting but refused to testify.

{¶ 34} Similarly, in *Grimes*, 2005-Ohio-203, several witnesses to a shooting reluctantly testified at trial and one witness offered inconsistent testimony. The latter witness had identified the defendant as the shooter in a previously recorded statement but testified at trial that she did not see the defendant do anything. The state introduced the recorded statement, which also included allegations that the

defendant's family had threatened the witness and had likely intimidated other witnesses. The recording was played for the jury. The defendant moved for a mistrial, which the trial court denied.

{¶ 35} On appeal, the First District upheld the trial court's denial of the motion because the trial court had given the jury a limiting instruction that the recording could only be used for the purpose of identification. The First District overruled the defendant-appellant's contention that the trial court had improperly permitted the state to allude to witness intimidation by the defendant's family and friends. The First District reasoned that although "[i]t was never alleged that [the defendant] himself attempted to intimidate any witness," *id.* at ¶ 55, "the references to witness intimidation were not improper because they were offered to demonstrate why the witnesses' stories had changed, and why some of the witnesses had not immediately come forward to the police with information about the shooting." *Id.* at ¶ 56. The First District cited to *State v. Carillo*, 2d Dist. Clark No. 00CA0025, 2000 Ohio App. LEXIS 4727, (Oct. 13, 2000), in which the trial court had admitted witness-intimidation evidence to bolster the witnesses' credibility. *Id.* at ¶ 57. The First District similarly reasoned that evidence of witness intimidation is admissible "to show that the problem was not the with the evidence, but with the witnesses' hesitance." *Id.* at ¶ 58.

{¶ 36} Consistent with *Grimes*, the trial court in the instant case admitted the evidence so that the state could explain why witnesses such as K.R. and M.L. did not appear at trial; why it took M.L.B. more than a year to meet with Detective

Vinson and identify his brother's shooter; and why A.H. was reluctant to testify. Further, to limit any prejudice to Jones, the trial court voir dired each juror to make sure they understood Jones had nothing to do with the threats or images, the threats could only be used when considering the witnesses' credibility, and the "Free Frank" photo could only be used for purposes of identification – that a member of the public believed Jones was named "Frank." Although A.H. testified that she received a picture of R.M. on the witness stand, which included an image of a crossed-out rat and stated that people were going to get "hurt," this picture was never admitted into evidence.

{¶ 37} Jones construes *Grimes*, 2005-Ohio-203, as permitting evidence of witness intimidation unconnected to the defendant in either of two narrow circumstances: (1) to explain why witnesses changed their stories, and (2) to explain why witnesses did not immediately come forward. Jones argues that neither of these circumstances is present in this case because there was no allegation that the witnesses changed their stories, and the identification witnesses testified that they immediately came forward with information about the shooter, which shows that they did not fear retaliation.

{¶ 38} At trial, however, Jones cast doubt on whether R.M. had talked to the police on the night of the shooting, observing that the officers who testified did not recall that anyone had identified the shooter, the name of "Frank" did not appear in any police reports, the photo array in which R.M. identified Jones as the shooter followed the shooting by a full two weeks, and the identification had been initiated

by Detective Vinson, not R.M.  Jones also cast doubt on whether R.M. and M.L.B. told A.H. that "Frank" was the shooter after they arrived at the hospital following the shooting.  A.H. testified that she had spoken with several people who witnessed the shooting, including her son M.L.B., but she was unable to get them to speak with Detective Vinson or the assistant prosecutor.  Eventually, M.L.B. met with Detective Vinson a year and four months following the shooting and identified Jones as the shooter.  Jones even asked A.H. at trial why it had taken her several hours to relay to Detective Vinson that R.M. and M.L.B. had identified "Frank" as the shooter after they arrived to the hospital following the shooting.

{¶ 39} Jones's questions were intended to undermine the credibility of each witness, the implication being that if any of the witnesses could identify the shooter, why had they waited so long to make that identification to the police?  The state anticipated that at least two other witnesses would testify, but neither appeared.  K.R., the second shooting victim, did not appear despite the trial court's issuing a material-witness warrant to secure his appearance.  M.L. also did not appear even though the state announced her appearance in its opening statement.  The state offered evidence of witness intimidation not just to explain why these witnesses never came forward, but also to explain why the witnesses who did come forward did so reluctantly, after a period that Jones highlighted at trial as an unreasonable delay, and only following Detective Vinson's repeated attempts to reach them.

{¶ 40} Jones also argues that the trial court misapplied *Grimes*, 2005-Ohio-203, because in the instant matter, the evidence of witness intimidation surfaced at

trial, after the witnesses testified (as was the case with R.M. and M.L.B.), or just before a witness testified (as was the case with A.H.), whereas *Grimes* concerned evidence of witness intimidation prior to trial. In this case, however, the timing of the witness-intimidation evidence is irrelevant because the evidence merely corroborated M.L.B.'s prior testimony that he feared retaliation for identifying the shooter and A.H.'s testimony that she, too, feared for her and her son's safety. M.L.B.'s and A.H.'s prior testimony also weakens Jones's contention that admitting the witness-intimidation evidence resulted in unfair prejudice because the jury had already heard the witnesses say that they feared retaliation for testifying. The trial court also limited any prejudice to Jones when it questioned each juror on the record, and each juror stated that he or she would judge the case fairly and impartially and use the evidence as instructed. *See State v. Stallings*, 89 Ohio St.3d 280, 297, 2000-Ohio-164, 731 N.E.2d 159, quoting *State v. Phillips*, 74 Ohio St.3d 72, 89, 1995-Ohio-171, 656 N.E.2d 643. ("'A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court.'").

{¶ 41} A trial court is best positioned to determine the impact of a spectator's actions on jury deliberations. *State v. Burnett*, 8th Dist. Cuyahoga No. 79432, 2002 Ohio App. LEXIS 1948, 13-14 (Apr. 25, 2002), citing *State v. Bradley*, 3 Ohio St.2d 38, 40-41, 209 N.E.2d 215 (1965). Here, the trial court reviewed the evidence, evaluated the effect of the evidence on each juror, and instructed the jury in order to insulate Jones from potential prejudice. *See State v. Alexander*, 8th Dist. Cuyahoga No. 106556, 2019-Ohio-451, ¶ 39 ("A trial court can minimalize potential prejudice

by limiting instructions * * * before submitting the case to the jury."). Therefore, the trial court did not abuse its discretion in denying Jones's motion for mistrial or in admitting testimony of witness intimidation for the purpose of determining the witnesses' credibility as well as the "Free Frank" photo for the purpose of identifying "Frank" as Jones, which the trial court limited to the "belief" of a single spectator at trial.

{¶ 42} Accordingly, Jones's second assignment of error is overruled.

## C. Removal of a Juror from Deliberations

{¶ 43} In his third assignment of error, Jones argues that the trial court abused its discretion and deprived him of a fair trial by removing Juror No. 4 from the jury deliberations. Jones contends that the jury appeared to be deadlocked when issues involving Juror No. 4 emerged, and the day after Juror No. 4 was removed, the jury returned a guilty verdict, resolving the apparent deadlock. Jones maintains that Juror No. 4 could not be removed absent evidence of misconduct and the trial court erred by removing Juror No. 4 instead of issuing a *Howard* charge. The state argues that the parties and the trial court all agreed that Juror No. 4's confrontational behavior during the jury's deliberations warranted his removal. The state also argues that the trial court separately questioned the former foreperson and newly elected foreperson to make sure their complaints about Juror No. 4 were not calculated to remove a barrier to unanimity, and both jurors agreed that it was Juror No. 4's behavior, not his position on the case, that gave rise to the complaint.

{¶ 44} Because the parties agreed to Juror No. 4's removal, we review the removal for plain error. When a party fails to object to an error in the trial court, a reviewing court may only notice plain errors or defects affecting substantial rights. Crim.R. 52(B). A reviewing court is subject to three limits when correcting plain error:

> "First, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of CrimR. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights[,]' * * * mean[ing] that the trial court's error must have affected the outcome of the trial."

*State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. Reversal is warranted if the party asserting the error can show that "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. Plain error should be noticed "with the utmost caution, under exceptional circumstances[,] and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶ 45} Both R.C. 2945.29 and Crim.R. 24(G) address removal of jurors during criminal trials. *State v. Zaragoza*, 2d Dist. Montgomery No. 26706, 2016-Ohio-144, ¶ 18, citing *State v. Cunningham*, 2d Dist. Clark No. 10-CA-57, 2012-Ohio-2794, ¶ 45.

> R.C. 2945.29 permits a court to replace a juror with an alternate "[i]f, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty[.]" Crim.R. 24(G)(1) similarly provides that alternate jurors "shall replace jurors who, prior to the

time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Moreover, "[a]s of 2008, Crim.R. 24(G)(1) allows the court to replace a juror after deliberations have begun." *State v. Hunt*, 10th Dist. Franklin No. 12AP-103, 2013-Ohio-5326, P 71. "However, '[i]f an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.'" *Id.*, quoting Crim.R. 24(G)(1).

*Id.*

{¶ 46} "A trial judge is empowered to exercise 'sound discretion to remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty is impaired.'" *State v. Brown*, 2d Dist. Montgomery No. 24541, 2012-Ohio-1848, ¶ 46, quoting *State v. Hopkins*, 27 Ohio App.3d 196, 198, 500 N.E.2d 323 (11th Dist.1985); *see also State v. Taylor*, 2d Dist. Montgomery No. 28463, 2020-Ohio-3481, ¶ 18. A court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A decision is unreasonable when "'no sound reasoning process * * * would support that decision.'" *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 47} Here, two days after jury deliberations began, the trial court learned that Juror No. 6, the original foreperson, decided to step down. The next day, Juror No. 11, the newly elected foreperson, informed the bailiff that Juror No. 4 was behaving aggressively toward other jurors and asked what happens if the jury cannot reach a unanimous verdict. The trial court considered issuing a *Howard* charge, but after reviewing the matter with the parties, suspended jury deliberations and

separately questioned Juror Nos. 11, 4, and 6 to learn more about the issue involving Juror No. 4 before further instructing the jury. The trial court advised each juror not to disclose any part of their deliberations.

{¶ 48} Both Juror Nos. 11 and 6 stated that Juror No. 4 was monopolizing deliberations, talking over other jurors, and at some points shouting at other jurors. When asked to be quiet and let other jurors speak, Juror No. 4 replied, "Come over here and make me shut up." Juror No. 11 noted that Juror No. 4 was particularly hostile to the former foreperson, had shouted at her on one occasion, and afterwards sat down, his lip quivering and his eyes watering. This confrontation forced the jury to discontinue deliberations and reconvene the following day. Both Juror Nos. 11 and 6 explained that even after implementing turn-taking rules and electing a new foreperson to facilitate discussion, Juror No. 4 remained aggressive, causing other jurors to disengage from deliberations. When asked if Juror No. 4 presented a barrier to a unanimous verdict, Juror Nos. 11 and 6 both stated that it had nothing to do with his position but rather with his manner of engaging in deliberations. Juror No. 11 attributed Juror No. 4's emotional outbursts to Juror No. 4's sharing that he had witnessed a close friend die during the shootings at Chardon High School in 2012, which the trial court's review of the record showed that Juror No. 4 had not disclosed during voir dire before the jury was empaneled. The trial court therefore elected to replace Juror No. 4 with an alternate and advised the jury that they had to begin deliberations anew.

{¶ 49} The record reveals that the trial court did not abuse its discretion when it replaced Juror No. 4 with an alternate based on its findings that Juror No. 4 was dominating the deliberations despite several attempts to establish rules for turn-taking, was aggressive to the point of physical confrontation with other jurors, was disruptive to the deliberations, and was not entirely honest during voir dire. *See Zaragoza*, 2016-Ohio-144, at ¶ 23 (juror was removed after having been found unstable, disruptive to deliberations, and a safety threat to female jurors); s*ee also State v. Segines*, 8th Dist. Cuyahoga No. 89915, 2008-Ohio-2041, ¶ 66 (juror was removed for exhibiting odd behavior and not being entirely forthcoming). The trial court and parties were in the best position to judge the jurors' demeanor during questioning. *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 42, citing *State v. Glover*, 35 Ohio St.3d 18, 20, 517 N.E.2d 900 (1988). After questioning the jurors, the trial court and the parties both agreed that Juror No. 4's removal was necessary. For the foregoing reasons, the trial court's decision to remove Juror No. 4 was not an obvious defect in the trial proceedings, and even if it were, Jones has not demonstrated that it affected the outcome of the trial.

{¶ 50} Accordingly, Jones's third assignment of error is overruled.

**D. Constitutionality of the Reagan Tokes Law**

{¶ 51} In his fourth assignment of error, Jones argues that his indefinite sentence under the Reagan Tokes Law violates (1) the constitutional right to a trial by jury, (2) the separation of powers doctrine, and (3) due process. Our en banc

decision in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.), overruled the same challenges to the Reagan Tokes Law that Jones raises in this appeal.

{¶ 52} Therefore, Jones's fourth assignment of error is overruled.

{¶ 53} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

MICHELLE J. SHEEHAN, P.J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR