[Cite as *State v. Bethel*, 2024-Ohio-1365.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 112921 |
| v. | : | |
| ARTHUR BETHEL, | : | |
| Defendant-Appellant. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 11, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-676907-B

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Mason McCarthy, Assistant Prosecuting Attorney, *for appellee*.

Donald Butler, *for appellant*.

FRANK DANIEL CELEBREZZE, III, J.:

{¶ 1} Appellant Arthur Bethel ("appellant") brings this appeal challenging his convictions for having a weapon while under a disability and multiple counts of felonious assault, along with firearm specifications, and the denial of his Crim.R. 29

motion for acquittal. After a thorough review of the applicable law and facts, we affirm the judgment of the trial court.

## I. Factual and Procedural History

{¶ 2} This matter arises from a shooting that occurred in March 2022 in Warrensville Heights. On the night in question, sometime after 4:00 a.m., former Shaker Heights Police Officer Alexandria Starcher was in her patrol car at the intersection of Lee Road and Chagrin Boulevard. While she was waiting at a traffic light, a blue Nissan Kick with a female driver stopped by her cruiser. The windows of the vehicle were rolled down, and the female driver and male passenger were screaming that "he" had been shot and that they needed help.

{¶ 3} Ptl. Starcher exited her vehicle and went to the blue car. The driver opened the rear driver's side door, and Ptl. Starcher observed a small, young boy "hunkered down" in the seat. He told her that he needed help and that his chest hurt. The boy, J.P., was ten years old at the time.

{¶ 4} Backup arrived on the scene, and Ptl. Starcher and another officer removed the boy from the vehicle. Ptl. Starcher had noticed that J.P. had blood on him, so the officers removed his shirt and pants to look for any bullet hole wounds. Ptl. Starcher observed two circular holes on J.P. Her partner placed a chest seal over the holes to prevent any further blood loss. Once EMS arrived, they took J.P. in the ambulance to the hospital. Ultimately, he recovered but had been shot in the back, shoulder, and leg. He was in the hospital for a week and had to relearn how to walk because of having been shot in the leg.

{¶ 5} Warrensville Heights police were called to the scene after Ptl. Starcher learned that the shooting had occurred in Warrensville Heights. Ptl. Starcher took photographs of the blue vehicle and observed "more than a handful" of bullet holes on the outside.

{¶ 6} Warrensville Heights Police Sergeant Jerome Thomas arrived on scene along with Sergeant Adam Scherrer. Sgt. Thomas observed a blue Nissan Kick with six to ten bullet holes on the outside of it. He learned that the driver of the vehicle was named Blaze Davis ("Blaze") and that the young shooting victim was the brother of the man in the passenger seat of the Nissan, Rondale Curlee, who was also known as "Brody."

{¶ 7} Blaze was very scared at the time. She expressed that she wanted to get to the hospital to be with the victim and tried to walk away from the officers. At one point, Blaze was acting very agitated; the officers handcuffed her to get her to calm down. After she was calmer, she was able to talk to the officers and visit the scene of the shooting.

{¶ 8} Sgt. Thomas drove Blaze back to the scene of the shooting, which was an Exxon gas station on Miles Road, and had her explain to him what had happened. Blaze stated that the shooting was by a black vehicle with multiple occupants. She believed that two occupants of the vehicle had firearms.

{¶ 9} Ptl. Reginald Rucker and Ptl. Stetka went to the gas station and spoke with the clerk working that night. After speaking with the clerk, who confirmed that there had been a shooting, the officers went outside to look for shell casings.

Because it was dark, and the weather was very windy and rainy, the officers had to hurry to collect any evidence. Ptl. Rucker located nine shell casings at the west entrance/exit of the gas station.

{¶ 10} Ptl. Stetka then went to the hospital where J.P. was going into surgery. He learned that Brody was also there, being treated for minor injuries. Brody was able to tell Ptl. Stetka what had happened and identified someone known as "Main" as a suspect and stated that the vehicle where the shots had come from was dark-colored. Brody told Ptl. Stetka that Main had pulled a firearm on him at an earlier encounter.

{¶ 11} There was a security guard at the gas station. Prior to the incident occurring, there were eight to ten vehicles at the gas station, and the security guard had told them to disperse. When asked about the incident by Ptl. Rucker, the guard stated that he was inside the station at the time, but that he had not observed any shooting that night. He did not call the police because he did not believe the shooting had occurred on the gas station property.

{¶ 12} Sgt. Michael Turner went to the Exxon station to retrieve the surveillance camera video. He spoke with the owner of the gas station, who was aware that a shooting had occurred on the property. The owner had trouble accessing the video but was able to pull it up on his cell phone. Sgt. Turner used his body cam to record the footage from the owner's cell phone.

{¶ 13} There was footage from two different cameras at the gas station. The first camera depicted the parking lot area on the west side of the gas station. The

video showed a darker-colored vehicle and a lighter-colored Mercedes. The second camera depicted the south side of the gas station, where the pumps were located. Blaze's Nissan Kick can be seen in the video.

{¶ 14} The video showed three heavy-set individuals getting into a silver Mercedes and driving southbound through the Exxon parking lot. The Mercedes can be seen pulling alongside the driver's side of the Nissan Kick. The Mercedes paused briefly, and then the Nissan Kick pulled away at a high rate of speed. The Mercedes then left as well. Sgt. Turner did not observe any altercation between the occupants of the two vehicles nor did he observe any weapons.

{¶ 15} Janay Bland ("Bland") was at the gas station on the night in question. Bland knew appellant, whom she knew as "Inky," and appellant's codefendant, Ju'veil Bethel ("Ju'veil"), whom she knew as "Veil." She heard shots that night but did not know how many; she did not see the shooting. She did not see appellant or Ju'veil at the gas station.

{¶ 16} Rayana Howard ("Howard") was also at the gas station that night and saw appellant and Ju'veil in a two-door Mercedes. She observed Ju'veil in the driver's seat and appellant in the passenger seat.

{¶ 17} Brody saw the Mercedes pull up next to the Nissan Kick in which he was a passenger. He had seen Ju'veil driving the vehicle. Brody was looking down at his phone when he saw laser beams on the windows — one on the front window and one on the back. He saw the barrel of a gun point toward the window on the driver's side. He could not see who was holding the gun, but saw an individual in a

white shirt. He believed that Ju'veil had been wearing a white shirt earlier that night. He told Blaze to drive, and as she took off, shots were fired. J.P. was hit multiple times, and Brody was grazed by a bullet on his back.

{¶ 18} At the police station the following day, Det. Curry showed Brody a photo lineup. From that lineup, Brody identified Ju'veil as having had flashed his gun at him earlier on the night of the shooting. This differed from when he initially told Ptl. Stetka that it was Main who had flashed his gun at him.

{¶ 19} J.P. was in the backseat of the Nissan Kick and had observed a "guy" driving the Mercedes, a "boy" in the backseat, and a "girl" in the passenger seat. He saw the guns pointed at Blaze's car but did not get a good look at who was shooting at them.

{¶ 20} Appellant and Ju'veil were each charged with four counts of felonious assault, with accompanying one-, three-, and five-year firearm specifications, and one count of having a weapon while under a disability.

{¶ 21} The matter proceeded to a jury trial where appellant and Ju'veil were tried as codefendants. Appellant and Ju'veil waived their rights to a jury trial as it pertained to their individual charges of having a weapon while under a disability, and those counts were decided by the court.

{¶ 22} The state presented the testimony of Ptl. Starcher, Ptl. Christopher Jordan, Sgt. Thomas, Ptl. Stetka, Ptl. Rucker, Sgt. Turner, Bland, Charlene Bethel (appellant and Ju'veil were her husband's nephews), Howard, Blaze, Brody, J.P., and Det. Curry. Appellant did not present any witnesses or evidence.

{¶ 23} The jury found appellant guilty of all four counts of felonious assault. The court found appellant guilty of having a weapon while under a disability.[1] He was sentenced to a total prison term of 29 to 31 ½ years. Appellant then filed the instant appeal, raising two assignments of error for our review:

> 1. The trial court erred in denying appellant's motion for acquittal on all charges because the state failed to present sufficient evidence to sustain the conviction.

> 2. Appellant's conviction is against the manifest weight of the evidence.

## II. Law and Analysis

## A. Crim.R. 29 Motion

{¶ 24} In his first assignment of error, appellant argues that the trial court erred in denying his motion for acquittal on all charges. Specifically, he contends that the state did not present sufficient evidence that appellant knowingly caused physical harm to the victim. He contends that none of the victims testified that appellant was the person who shot at them or possessed a firearm.

{¶ 25} Crim.R. 29(A) provides that a court "shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." "Because a Crim.R. 29 motion questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.'"

---

[1] The jury found Ju'veil guilty of all four counts of felonious assault, and the court found him guilty of having a weapon while under a disability. He has not filed an appeal as of the date of this opinion.

*Fairview Park v. Peah,* 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37, quoting *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 26} A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 27} A defendant is entitled to an acquittal of one or more offenses under Crim.R. 29 "[i]f the evidence is insufficient to sustain a conviction." *State v. Macalla*, 8th Dist. Cuyahoga No. 88825, 2008-Ohio-569, ¶ 38. In order to satisfy the burden of production, a party is required to furnish ample evidence to establish a prima facie case. *See State v. Petway*, 2020-Ohio-3848, 156 N.E.3d 467, ¶ 47 (11th Dist.). The role of an appellate court is not to determine whether the evidence presented by the state should be accepted as true, but rather to ascertain if the evidence, when accepted as true, would sustain a conviction against the defendant. *State v. Nelson*, 8th Dist. Cuyahoga No. 100439, 2014-Ohio-2189, ¶ 14, citing *Thompkins* at 390. We are precluded from setting aside a conviction based on insufficiency of the evidence, unless we conclude "that reasonable minds could not

reach the conclusion reached by the trier of fact." *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

{¶ 28} "'Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *State v. Rodano*, 2017-Ohio-1034, 86 N.E.3d 1032, ¶ 35 (8th Dist.), quoting *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18. Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence. *Id.*, citing *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Further, circumstantial evidence may not only be sufficient, ""but may also be more certain, satisfying, and persuasive than direct evidence."" *Id.* at ¶ 36, quoting *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 29} It is clear that there was significant inconsistent testimony presented at trial from the individuals that were present on the night of the shooting. Inconsistencies existed both among the testimony of the witnesses that were at the gas station and between the witnesses' testimony and their prior statements to police. Several of the witnesses admitted to having consumed alcohol that evening (despite being underage), which may have affected their recollection of events.

{¶ 30} However, there was consistent testimony that (1) a silver two-door Mercedes pulled up to the Nissan Kick and soon after, the Nissan Kick sped off; (2)

the shots fired at the Nissan Kick came from the vehicle next to it, which was the silver Mercedes; (3) the bullet holes on the vehicle were located on the side that would have been next to the silver Mercedes; (4) a silver two-door Mercedes was registered to Ju'veil; (4) Ju'veil was the driver of the silver Mercedes that night, and appellant was a passenger; (5) an unidentified young woman was the only other occupant of the vehicle; (6) two guns were pointed out of the passenger-side window; and (7) laser beams were seen coming from the silver Mercedes into the Nissan Kick. While the surveillance video does not show the actual shooting, it does depict a brief interaction between the silver Mercedes and the blue Nissan Kick, after which the Nissan Kick sped off.

{¶ 31} A person acts knowingly, regardless of his purpose, "when he is aware that his conduct will probably cause a certain result * * * ." R.C. 2901.22(B). "The shooting of a gun in a place where there is a risk of injury to one or more person supports the inference that appellant acted knowingly." *State v. Grant*, 8th Dist. Cuyahoga Nos. 90465 and 90466, 2008-Ohio-3970, ¶ 18, citing *State v. Gregory*, 90 Ohio App.3d 124, 131, 628 N.E.2d 86 (12th Dist.1993), citing *State v. Cartellone*, 3 Ohio App.3d 145, 148, 444 N.E.2d 68 (8th Dist.1981). Appellant was in the backseat of the silver Mercedes and fired a gun in the direction of the vehicle immediately next to him. Under these circumstances, appellant's intent to cause serious physical harm is inferred from his shooting the gun directly at the Nissan Kick, which contained three occupants.

{¶ 32} The cumulative evidence, if believed, sufficiently established appellant's identity as one of the individuals who fired a weapon into the Nissan Kick and ultimately shot J.P. in the back, shoulder, and leg. After viewing the evidence in a light most favorable to the state, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant had knowingly caused serious physical harm to J.P. and attempted to cause physical harm to all three occupants of the Nissan Kick. The trial court therefore did not err in overruling appellant's Crim.R. 29 motion for acquittal, and appellant's first assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 33} In his second assignment of error, appellant argues that his conviction was against the manifest weight of the evidence. He again asserts that none of the victims testified against him, and none of the testifying witnesses stated that they personally observed appellant shooting at the victims or even possessing a firearm. He further contends that no ammunition or weapons were found in his room when it was searched by police. Finally, he argues that Det. Curry testified that when he reviewed the surveillance video of the gas station, he did not witness any person, including appellant, shooting a firearm.

{¶ 34} When reviewing a manifest weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin* at 175.

{¶ 35} As this court has previously stated:

> The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 1997-Ohio-52, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id*. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87.

{¶ 36} In its role as the "thirteenth juror," an appellate court must review the entire record, weigh the direct and circumstantial evidence and all reasonable inferences drawn therefrom, and consider the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the [trier of fact] clearly

lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *Martin.*

{¶ 37} As discussed above, the state's case rested on circumstantial evidence, which "requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *State v. Wachee*, 8th Dist. Cuyahoga No. 110117, 2021-Ohio-2683, ¶ 36, quoting *Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. *Id.*, quoting *id.* "'Circumstantial evidence is proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.'" *Id.*, quoting *State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37. "Circumstantial evidence and direct evidence inherently possess the same probative value." *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus.

{¶ 38} Again, there was inconsistent testimony presented by the state's witnesses. However, "a defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness'[s] testimony are inconsistent or contradictory." *State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 40. *See, e.g., State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 45 (8th Dist.); *see also State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38 ("A conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony."); *State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37, quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, 7 (May 28, 1996) ("'While [a

factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"). Any inconsistencies in the testimony presented do not establish that the jury clearly lost its way in finding that appellant was one of the shooters.

{¶ 39} Regarding the lack of direct identification of appellant or the failure to recover any weapons or ammunition from appellant, as we have explained, circumstantial evidence and direct evidence are indistinguishable so far as the jury's factfinding function is concerned. All that is required of the jury is that it weighs all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. Circumstantial evidence placed appellant in the vehicle as one of the shooters; a direct identification by one of the victims was not required.

{¶ 40} Having reviewed the entire record, we cannot say the jury in this case clearly lost its way and created such a manifest miscarriage of justice that appellant's convictions must be reversed and a new trial ordered. Appellant's convictions were not against the manifest weight of the evidence, and his second assignment of error is overruled.

### III. Conclusion

{¶ 41} The trial court did not err in denying appellant's Crim.R. 29 motion for acquittal. In addition, appellant's convictions were not against the manifest weight of the evidence. All of appellant's assignments of error are overruled, and the judgment of the trial court is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, JUDGE

MARY EILEEN KILBANE, P.J., and
LISA B. FORBES, J., CONCUR