[Cite as *State v. Nashe*, 2024-Ohio-3400.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                          No. 112947

    v.                            :

DENNIS NASHE,                           :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED, VACATED AND REMANDED
**RELEASED AND JOURNALIZED:** September 5, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-673815-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Dominic Neville, Assistant Prosecuting Attorney, *for appellee.*

Carolyn Kaye Ranke, *for appellant.*

LISA B. FORBES, J.:

{¶ 1} Dennis Nashe ("Nashe") appeals his convictions. After reviewing the facts of the case and pertinent law, we affirm Nashe's convictions, vacate his sentence, and remand the case back to the trial court for the limited purpose of resentencing.

## I.  Facts and Procedural History

{¶ 2}   On August 30, 2022, Nashe was indicted on a four-count indictment. Counts 1 and 2 were for felonious assault against victim Rael Chesney ("Chesney") in violation of R.C. 2903.11(A)(1) and (A)(2), both third-degree felonies.  Both counts included one-, three-, and five-year firearm specifications in violation of R.C. 2941.141, 2941.145, and 2941.146.  Count 3 charged Nashe with improper discharge of a firearm on or near a prohibited premises in violation of R.C. 2923.162(A)(3), a first-degree felony, also with a one-, three-, and five-year firearm specifications.  Last, in Count 4, Nashe was charged with felonious assault in violation of R.C. 2903.11(A)(2) against victim G.C., a second-degree felony, again with one-, three-, and five-year firearm specifications.

{¶ 3}   This matter proceeded to a jury trial on June 22, 2023.

## II.  Trial Proceedings

{¶ 4}   The following relevant testimony was elicited at trial.

### A. Gail Caldwell's Testimony

{¶ 5}   Gail Caldwell ("Caldwell") testified pertinently as follows.  She is a 19-year-old caregiver from Cleveland, and at the time of the incident, she was in a relationship with Chesney.  On June 16, 2021, Chesney was driving on the east side of Cleveland with Caldwell in the front-passenger seat.  While driving, he failed to stop fully at a red light and accidentally "love tapped" the back of the car in front of him.  Chesney failed to stop his car after the incident and continued driving. Chesney indicated to Caldwell that the vehicle he hit was following them.  Caldwell

encouraged Chesney to stop the car when, all of a sudden, she heard a loud "pop." She thought a tire had popped, but Chesney indicated that someone was shooting at them. At that point, Caldwell began screaming uncontrollably. They were on a main street going very fast when "it was just, pop, pop, pop on the side" and then Chesney stated, "I'm hit." Caldwell looked over at Chesney and saw blood everywhere.

{¶ 6} When asked the color of the car that Chesney hit, Caldwell testified, "I don't really remember. I want to say like blue maybe." Caldwell stated that during the chase, they were going probably 70-90 m.p.h. down the main street. The car chasing them was on her right side. When she heard the popping, the car chasing them was on the passenger side of Chesney's vehicle. Once she realized she was being shot at, Caldwell got low in the vehicle to avoid the bullets. She attempted to call the police but struggled to talk to them because she was screaming.

{¶ 7} Caldwell testified that after Chesney was shot, he pulled over. Chesney tried to drive to the hospital but was unable to do so. After they stopped, Caldwell saw a police car. She got out of the vehicle and ran to the police car. She claimed she informed the officer that Chesney had been shot and that they needed help. Chesney was eventually taken away from the scene on a stretcher.

{¶ 8} Upon cross-examination, Caldwell indicated she did not remember telling the police she was going to get her hair done. She reiterated that Chesney's car barely made contact with the other vehicle and that he attempted to swerve out of the way to avoid scraping the vehicle. Caldwell testified that she never talked with police on scene or provided them a description of what happened. She testified that

she made a statement but never gave a description of anything. She never saw the driver of the other vehicle and could not see how many people were in the car. She heard the loud pop behind her through the rear-passenger door but did not see anyone actually shoot at her. She did not know if the shooter was a male or female.

**B. Rael Chesney's Testimony**

{¶ 9} Chesney testified that he was shot in the right side of his back/shoulder. The bullet is still lodged there. Chesney was driving his mother's car taking Caldwell, his girlfriend at the time, to a hair appointment on the west side of Cleveland. He did not have permission to use his mother's vehicle because he did not have a driver's license or car insurance. This was his first time driving the car.

{¶ 10} Chesney testified he was driving 20 m.p.h. when his vehicle "bumped" the car in front of him that was stopped at a red light. His whole front bumper hit the car in front of him. He attempted to flee the scene because he did not have a license and was not supposed to be driving his mother's car. He had to back-up and drive around the vehicle he hit to leave the scene. As he fled, the car he hit began to chase him. He was driving over 50 m.p.h. Eventually someone in the car started shooting bullets at him. Chesney could not tell if the driver was alone in the other vehicle. Several shots were fired before one bullet came through the back window and hit Chesney in the back/shoulder.

{¶ 11} After he was shot, Chesney saw a police officer. He got out of his vehicle to ask for assistance. The officer told him to stay in the car and called an

ambulance, which came and took Chesney to the hospital. He spoke with two officers after the incident.

{¶ 12} Chesney was unable to identify the shooter from a photographic line-up. Chesney was able to identify the vehicle that chased him in a video played for the jury. The State's video showed Chesney fleeing the scene being chased by a black car. Chesney testified that when he turned onto Broadway, the shooting started. Chesney heard more than ten shots fired.

{¶ 13} Chesney testified on cross-examination that he could not say if the driver of the black car was male or female, white or black. He never saw the driver of the car or saw anyone shoot at him from that vehicle but knows someone in the black car was shooting at him.

{¶ 14} He recalled talking to the police but did not recall what he said to them. He claimed he never told the police he stopped and exchanged information with the driver of the black vehicle and if the officers said that he did they would be incorrect. He never got out of the vehicle and did not have a driver's license. Chesney testified that there was no damage to the black car his vehicle tapped. The bullets came through the back window, which was shot out, and one bullet went through the driver's seat to hit him in his back/shoulder.

## C. Officer's Nathaniel Ellis's Testimony

{¶ 15} Cleveland Police Officer Nathaniel Ellis ("Officer Ellis"), testified at trial. He has been a patrol officer for nine years. On June 16, 2021, Officer Ellis was on patrol, working second shift, patrolling around the Aetna and East 70th area. He

was driving westbound on Aetna when he was flagged down by a female who appeared frantic and scared. The female came from the passenger side of a vehicle. She told him that her boyfriend had been shot. While she was talking to him, Officer Ellis turned his body camera on and called EMS. Officer Ellis checked on the victim who was shot. He identified the victim as Chesney.

{¶ 16} Officer Ellis identified the report he created for this incident. It was dated June 16, 2021. He testified that he learned from speaking to Caldwell and Chesney that they were driving northbound on Broadway and were being chased by another vehicle driven by a male. At the time, they did not remember or know why they were being chased. The State then played Officer Ellis's body-camera footage for the jury. The footage showed Caldwell and Chesney approaching him in his vehicle, both visibly distraught. Officer Ellis recalled seeing bullet defects in the vehicle, especially the one in the back-rear passenger window. He testified that he was provided Chesney's driver's license. Officer Ellis saw Chesney get into an ambulance with EMS.

{¶ 17} Officer Ellis corrected his testimony on cross-examination that he could not have reviewed Chesney's driver's license because he did not have one. Chesney did not tell Officer Ellis that he had just been in an accident prior to the incident. Rather, Chesney told him he was being chased and he had absolutely no idea why. Caldwell told him that they had been in a minor fender bender with another vehicle and that they did not want to stop so they pulled away. Officer Ellis testified that he did not see the accident or see Chesney get shot.

**D. Carmen McKinney's Testimony**

{¶ 18} Carmen McKinney ("McKinney"), Nashe's mother, testified that on June 15, 2021, she rented a 2021 black Toyota Camry from Avis Rental. On June 16, 2021, she left this rental car with her son, Nashe.

{¶ 19} On cross-examination, McKinney testified that she rented the vehicle so Nashe could transport his son back and forth from school to after-school activities. She has rented vehicles for Nashe five to six times before. Nashe was saving money to buy his own car. When McKinney returned her Camry to Avis on June 28, 2021, there was no damage — no scratch or bump — to the vehicle. She repeated that she told the detective that she was unsure who was driving her vehicle and provided Nashe's and her other two sons' phone numbers to the detective.

**E. Detective Thomas Cannole's Testimony**

{¶ 20} Detective Thomas Cannole ("Det. Cannole") works for the City of Cleveland Police Division as a crime-scene detective. He has worked for the Cleveland Police Department for over 30 years. He has been in the crime-scene unit for approximately three years. He is a certified evidence technician. His job involves documenting, collecting, and processing evidence. When he first arrives on a scene, he walks through the crime scene looking for evidence. He places markers where the evidence is found and then photographs it. He then collects the evidence and brings it back to the office to process and package.

{¶ 21} He identified the photographs he took of the evidence at the scene on June 16, 2021. Det. Cannole identified pictures he took of a shell casing for a 5/7 by

28 cartridge, as well as an envelope with five casings in it that were packaged together because they were collected from the same spot. He swabbed the casings for DNA. He testified that a small percentage of the time it is possible to get DNA evidence when someone handles bullets before firing them.

{¶ 22} Det. Cannole testified on cross-examination that shell casings typically eject to the right after being fired from a firearm. Most of the casings were found in the curb lane in the road; one shell casing was found on the sidewalk. Det. Cannole was unable to tell when a bullet was shot based solely on the shell casing. He sent DNA swabs to a laboratory to be tested. He had no idea what the DNA results for these shell casings showed.

{¶ 23} On redirect, Det. Cannole explained that where shell casings are found is not exactly where they initially landed since they tend to roll.

**F. Detective Ashley Schut's Testimony**

{¶ 24} Detective Ashley Schut ("Det. Schut") is employed by the Cleveland Police Department's fourth district as a detective. At the time of trial, she had been a detective for about three months. She was working on the evening of May 18, 2021, when she was called to the scene of an accident where Nashe was present. When she arrived, she saw two vehicles; one was a three-wheeled motor vehicle, and the other was a sedan. Two different parties were on scene. She spoke with Nashe that night. She was wearing her body camera at the time, which the State played for the jury.

{¶ 25} On cross-examination, Det. Schut testified that in her four years as a patrol officer, she has encountered over a hundred accidents. Regarding the May 18, 2021 accident, she recalled there was a dispute as to who was at fault. She recalled Nashe indicating that the other driver was intoxicated. She reviewed the footage at the prosecutor's request. Her report regarding the May 18, 2021 incident does not state that any party had a firearm or was threatening anyone with a firearm.

**G. Detective Demetrius Madison's Testimony**

{¶ 26} Detective Demetrius Madison ("Det. Madison") has been a detective for the Cleveland Police Department for two years at the fourth district's violent-crime reduction task force. He has been an officer for nine years. He was a patrol officer prior to becoming a detective. The violent-crime reduction task force investigates violent crimes, such as felonious assaults, shootings, and aggravated robberies. He testified that the fourth district is probably the largest district in Cleveland and that his department is very busy.

{¶ 27} He was assigned a shooting that occurred on June 16, 2021, and was called to the scene near Broadway and Aetna.

{¶ 28} When Det. Madison arrived on scene, he saw Chesney sitting in his vehicle with a gunshot wound to his shoulder. He spoke with Chesney while he was still in his vehicle and Chesney gave a brief description of the suspect's vehicle and where the incident occurred. Det. Madison observed Caldwell frantic and crying. Several other officers were on scene. Contrary to Chesney's testimony, Det. Madison stated that Chesney told him that he was shot by an older black male in a black

vehicle. He observed bullet holes in the right passenger side of Chesney's vehicle and a shattered window.

{¶ 29} Det. Madison testified that five shell casings were found in the street on Broadway between Aetna and Baxer within 30 minutes of Officer Ellis arriving on scene.

{¶ 30} Det. Madison was shown photographs of Chesney's vehicle at impound lot two, where all seized vehicles are processed. Det. Madison identified the pictures as showing Chesney's vehicle with a window shattered. Det. Madison testified that five additional photographs showed the shattered window and five bullet defects in the passenger side of the vehicle. Det. Madison reiterated that five shell casings were found in the road. The exhibits show no damage to the front of the vehicle or the driver's side. Det. Madison also testified regarding a photograph of the inside of the driver's side interior of the car, which had a blood stain on the driver's seat. According to Det. Madison, the photographs accurately depict the vehicle as he saw it on that day.

{¶ 31} Det. Madison testified that the real-time crime center was able to get a license plate number from what they believe was the suspect's vehicle. Real-time cameras are set up all over the city, mostly in intersections, recording 24/7. The cameras record every vehicle that passes by. The cameras are monitored by the real-time crime center. Det. Madison testified that he was provided footage from the real-time crime center.

{¶ 32} He reviewed the footage in his office, which showed Chesney's vehicle being chased by a vehicle with an Illinois license plate number CU 19717, which was owned by Avis Car Rental. He then called Avis who provided him the rental agreement between Avis and McKinney, mother of Nashe. The vehicle was rented on June 15, 2021, and was returned on July 9, 2021.

{¶ 33} Det. Madison called McKinney who confirmed she had rented the vehicle. She initially stated only she could have been driving it. When asked again, she informed Det. Madison that she has three sons and that it could only be her son Nashe who was driving it. McKinney confirmed to Det. Madison that her son wears fashion glasses.

{¶ 34} Det. Madison conducted a photograph line-up in this case. He made an array of six photographs, which he showed to Chesney to see if he could identify Nashe. Chesney was not able to identify Nashe in the line-up. Det. Madison stated that it was common that victims are unable to identify who was shooting at them as they do not always get the opportunity to see them.

{¶ 35} After talking with McKinney, Det. Madison searched "Dennis Nashe" in the police database pulling BMV photographs to match the still photographs from the real-time cameras. He was looking in their database evidence.com, where he found a video from Det. Schut's body camera that showed an interaction with Nashe. He used this video to confirm his match to the real-time crime video footage and BMV photographs of Nashe. At this time, Det. Madison determined that Nashe was

the lead suspect for the shooter, and he went to the prosecutor's office and got a warrant for Nashe's arrest.

{¶ 36} The real-time crime footage of the vehicles played for the jury started at the intersection of East 131st and Harvard in Cleveland and ended at the intersection of Broadway and Aetna. The footage showed both Chesney's vehicle and the suspect's vehicle, the black Toyota Camry, both driving down the street. In the footage, Det. Madison could see there were two people in Chesney's vehicle and one person in the black Toyota Camry. The footage showed Chesney's vehicle being followed by the black Toyota Camry. Det. Madison testified that the footage showed the black Toyota Camry with the driver's side window rolled down. Det. Madison reviewed six still photographs from the real-time crime cameras video, which depicted the black vehicle with its driver's side window down, with a black male driver wearing glasses and a hat worn backwards.

{¶ 37} Det. Madison was also shown body-camera footage from an officer who responded to a motor-vehicle accident involving Nashe that occurred on May 19, 2021. The footage shows Nashe on the scene wearing a black hat backwards with glasses on, like the real-time camera footage.

{¶ 38} Det. Madison testified on cross-examination regarding his report, in which he stated that Chesney told him about tapping the black Toyota Camry, and that Chesney got out and checked the damaged and upon seeing none, Chesney left the scene. Det. Madison testified that Caldwell never said Chesney got out of the vehicle or that they stopped after the accident. Det. Madison acknowledged that

Caldwell and Chesney's stories were inconsistent. None of the camera footage showed the motor vehicle accident on June 16, 2021, nor does it show any firearms being used. Det. Madison never checked Nashe's driver's license to see if he wears corrective lenses, even though the suspect from the black Toyota Camry was seen wearing glasses.

{¶ 39} Det. Madison testified that one shell casing was found on the sidewalk and the others were found in the right lane of the road heading southbound. Det. Madison also agreed that it was possible the reason Chesney could not identify the shooter in the photograph line-up is because the shooter was not in the line-up. Det. Madison agreed that in the May 19, 2021 motor-vehicle accident, there was no evidence that Nashe threatened anyone with a firearm in connection with the accident. Det. Madison testified that he was not trained in photographic identification nor was he trained in forensics or how shell casings are ejected.

{¶ 40} Det. Madison admitted that there was no footage of Chesney's vehicle hitting the black Toyota Camry because there are dead spots where the surveillance cameras cannot record. The footage also does not show anyone in the black Toyota Camry brandishing or discharging a firearm.

{¶ 41} During cross-examination and on redirect, Det. Madison explained that a separate 9-1-1 call reported a discharge of a firearm by two black males in white t-shirts that were fleeing northbound in the same vicinity of the shooting in this case. The call was made at 6:10 p.m., and the shooting in this incident was reported at 6:12 p.m. the same day. Det. Madison stated that he never did any

additional investigation into this incident to see if there was any connection. Det. Madison is unsure if any officer talked to any people concerning this additional shooting, but he knows that officers responded to the call.

{¶ 42} Following the State's case, the State's exhibits were admitted into evidence. Nashe did not present any witnesses or proffer any exhibits.

## III. Communication with Jurors During Deliberations

{¶ 43} After the parties rested, the jury began its deliberations late in the afternoon on June 26, 2023. The next morning, it was brought to the court's attention that after trial on the 26th, one of Nashe's family members communicated with a juror in the presence of four other jurors. The court then held a hearing at which the five jurors were questioned concerning the incident and their ability to remain impartial.

{¶ 44} On the record in response to questioning by the trial judge, one juror stated that she was approached by a woman who asked if the jury was done for the day or if they would be coming back tomorrow. The juror replied, "I'm sorry. We cannot talk to you." The four other jurors witnessed this interaction. The judge asked each juror if this interaction influenced their ability to decide the case in a fair and impartial manner; each juror replied, "No." The court then allowed the State and defense counsel to inquire further.

{¶ 45} The prosecutor asked if it would make them feel uncomfortable for Nashe's family to be around for the rest of the proceedings to which the majority of the jurors responded they would feel uncomfortable. Defense counsel then asked if

they felt the family member was encroaching on their deliberations which the jurors agreed. One juror was disturbed by the question. The jurors also confided that it was the demeanor of the person that made them feel uncomfortable. All the jurors stated that they were not going to let this interaction affect them and that they can remain impartial in their deliberations.

{¶ 46} After the jury was sent back to continue deliberating, Nashe's counsel made an oral motion for a mistrial on the basis that the jurors indicated they were fearful of Nashe's family members based on their demeanor. Nashe's counsel argued that he cannot be assured of a fair verdict or trial and moved the court for a mistrial. The State argued that nobody said they were fearful, just uncomfortable. They all agreed they could still be fair and impartial such that there is no prejudice justifying a mistrial. The court denied the motion for a mistrial.

## IV. Verdict and Sentencing

{¶ 47} On June 27, 2023, the jury found Nashe guilty of all counts and specifications. On Count 1, felonious assault and serious physical harm against Chesney, the court sentenced Nashe to eight years in prison with the five-year firearm specification. Count 2, felonious assault with a deadly weapon against Chesney, merged with Count 1, except for the three-year firearm specification on which Nashe was separately sentenced. On Count 3, discharge of a firearm on or near prohibited premises, the court sentenced Nashe to 11 years in prison with the three-year firearm specifications. Last, the court sentenced Nashe on Count 4, felonious assault with a deadly weapon against Caldwell, to eight years in prison,

with the three-year firearm specifications.  The court then ordered all counts to be served consecutively for a total incarceration time of 41 years.

{¶ 48} It is from this judgment that Nashe raises five assignments of error for our review:

**First assignment of error**
The trial court committed reversible error in failing to declare a mistrial after four jurors were prejudiced by improper communication from appellant's family members

**Second assignment of error**
The trial court erred by convicting and sentencing Dennis Nashe to consecutive sentences on allied offenses of similar import

**Third assignment of error**
The trial court imposed a sentence contrary to law and violated Mr. Nashe's right to due process when it ordered consecutive sentences without stating the requisite statutory findings on the record

**Fourth assignment of error**
The trial court committed reversible error by including the penalty language and term of incarceration for the firearms specifications contained in the indictment

**Fifth assignment of error**
The convictions are against the manifest weight of the evidence

## V.   Law & Analysis

### A. First Assignment of Error — Communication with Jurors

{¶ 49} In Nashe's first assignment of error, he argues that the trial court committed reversible error when it failed to grant his motion for a mistrial after jurors were prejudiced by an improper communication from Nashe's family.  We disagree.

**{¶ 50}** A trial court has broad discretion to grant or deny a motion for a mistrial and will not be reversed on appeal absent an abuse of discretion. *State v. Shine*, 2018-Ohio-1972, ¶ 43 (8th Dist.), citing *State v. Iacona*, 93 Ohio St.3d 8, citing *State v. Sage*, 31 Ohio St.3d 173 (1987). "A mistrial should not be declared in a criminal case merely because some error or irregularity has occurred unless the substantial rights of the accused or the state have been adversely affected." *State v. Smith*, 1997 Ohio App. LEXIS 3760, *40 (8th Dist. Aug. 21, 1997).

**{¶ 51}** "When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror." *State v. Phillips*, 74 Ohio St.3d 72, 88 (1995), citing *Smith v. Phillips*, 455 U.S. 209, 215-216 (1982), and *Remmer v. United States*, 347 U.S. 227, 229-230 (1954), *see also State v. Stallings*, 89 Ohio St.3d 280 (2000). "'[I]n cases involving outside influences on jurors, trial courts are granted broad discretion in . . . determining whether to declare a mistrial or to replace an affected juror.'" *Stallings* at 296, quoting *Phillips* at 88.

**{¶ 52}** The complaining party must show actual prejudice. *Stallings* at 297, citing *State v. Keith*, 79 Ohio St.3d 514, 526-527 (1997). A trial court limits any prejudice to a defendant when it questions each juror on the record, and each juror states that he or she will judge the case fairly and impartially and use the evidence as instructed. *State v. Jones*, 2022-Ohio-2270, ¶ 40 (8th Dist.) ("The trial court also limited any prejudice to Jones when it questioned each juror on the record, and each juror stated that he or she would judge the case fairly and impartially and use the

evidence as instructed."). "A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court." *Phillips* at 89.

{¶ 53} In *Stallings*, jurors in a death penalty case were approached by someone outside of the courtroom who stated that "anything but the death penalty would be unacceptable." *Id*. at 296. The court held a hearing and conducted a separate voir dire of the jurors. There the jurors indicated they did not feel threatened in any manner and endeavored to be fair in considering the evidence. *Id*. Thus, the trial court found the defendant was unable to demonstrate prejudice and denied the motion for a mistrial. *Id*. *See also State v. Johnson*, 2003-Ohio-1826, ¶ 14 (8th Dist.) (Trial court's denial of a mistrial was appropriate when a juror stated they could remain impartial even though the defendant observed the juror entering her vehicle.).

{¶ 54} Here, the trial court properly held a hearing where each of the five potentially affected jurors were questioned concerning the incident. The involved jurors explained that a member of Nashe's family came up to them and asked one of them if they were going to make a decision today or would they have to come back tomorrow. The juror responded by stating, "I'm sorry. We cannot talk to you." When questioned by the State, several jurors said the interaction made them uncomfortable and they would prefer the family member not be in the trial room. However, none of the involved jurors said they felt threatened or fearful. Each juror, when asked, said the interaction did not affect their ability to be fair or impartial in their deliberations.

{¶ 55} Upon review, we find that this minor interaction was not prejudicial to Nashe and did not compromise the fairness of his trial. Nashe has not demonstrated that a substantial right has been affected by this incident and he has not shown actual prejudice from this incident. *Stallings*, 89 Ohio St.3d at 297.

{¶ 56} As such, we find the trial court did not abuse its discretion in denying Nashe's motion for mistrial. Nashe's first assignment of error is overruled.

**B. Second Assignment of Error —Allied Offenses**

{¶ 57} In his second assignment of error, Nashe argues that his convictions for felonious assault by means of a deadly weapon and discharge of a firearm on prohibited premises are allied offenses of a similar import that should have been merged. We disagree.

{¶ 58} An appellate court reviews de novo whether two offenses are allied offenses of similar import. *State v. Williams*, 2012-Ohio-5699, ¶ 28.

{¶ 59} R.C. 2941.25 states that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 60} In *State v. Ruff*, 2015-Ohio-995, ¶ 13, the Supreme Court held that if a defendant's conduct supports multiple offenses, the defendant can be convicted of all of the offenses if any one of the following is true: "(1) the conduct constitutes

offenses of dissimilar import or significance, (2) the conduct shows the offenses were committed separately, or (3) the conduct shows the offenses were committed with separate animus or motivation." *Id.* at paragraph three of the syllabus, citing R.C. 2941.25(B).

{¶ 61} The Supreme Court of Ohio has recognized two or more offenses of dissimilar import exist "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23. This court has previously held that felonious assault involves harm to a particular victim, whereas the victim of discharging a firearm upon or over a public road or highway is the public at large. *State v. Williams*, 2019-Ohio-794, ¶ 49 (8th Dist.); *State v. Carzelle*, 2018-Ohio-92, ¶ 9-10 (8th Dist.); *State v. Giglio*, 2023-Ohio-2178, ¶ 30 (8th Dist.).

{¶ 62} Here, we find, consistent with our case law, that Nashe's conduct constitutes offenses against separate victims. The victims of the two assault charges were Chesney and Caldwell. The victim of the discharging a firearm upon a public road or highway was the public at large. *See Williams* at ¶ 49; *Carzelle* at ¶ 9-10; *Giglio* at ¶ 30. Because there were separate victims, the offenses are of dissimilar import and the offenses do not merge as matter of law. *Id.*

{¶ 63} We overrule Nashe's second assignment of error.

**C. Third Assignment of Error — Consecutive Sentencing**

{¶ 64} Nashe's third assignment of error argues that trial court failed to make the requisite statutory findings on the record to support consecutive

sentencing as required by R.C. 2929.14(C)(4). The State in its brief concedes "that the trial court did not make a record to support a consecutive sentence," and asked this court to remand the case to the trial court for proper sentencing.

{¶ 65} A trial court may order prison terms to be served consecutively if it finds "the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." R.C. 2929.14(C)(4). Further, the court must also find any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crimes by the offender.

*Id.*

{¶ 66} We review felony sentences under the standard set forth in R.C. 2953.08(G)(2); *see State v. Marcum*, 2016-Ohio-1002, ¶ 1, 16. R.C. 2953.08(G)(2) provides that when reviewing felony sentences, a court may overturn the imposition of consecutive sentences only where the court "clearly and convincingly" finds that (1) "the record does not support the sentencing court's

findings under R.C. 2929.14(C)(4)," or (2) "the sentence is otherwise contrary to law." *State v. Jones*, 2024-Ohio-1083, ¶ 12.

{¶ 67} "It is well-established that where a trial court has imposed consecutive sentences in a sentencing journal entry, but failed to make all of the requisite statutory findings in support of the imposition of consecutive sentences at the sentencing hearing, the imposition of consecutive sentences is contrary to law." *State v. Philpot*, 2020-Ohio-104, ¶ 27 (8th Dist.). *See also State v. Tidmore*, 2019-Ohio-1529, ¶ 21 (8th Dist.); *State v. Lariche*, 2018-Ohio-3581, ¶ 25 (8th Dist.).

{¶ 68} "R.C. 2953.08(F) requires an appellate court to review the entire trial-court record, including any oral or written statements made to or by the trial court at the sentencing hearing, and any presentence, psychiatric, or other investigative report that was submitted to the court in writing before the sentence was imposed. R.C. 2953.08(F)(1) through (4)." *Jones* at ¶ 12.

{¶ 69} When imposing consecutive sentences, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and it must incorporate its findings into its sentencing entry. *State v. Bonnell*, 2014-Ohio-3177, ¶ 37. That being said, the trial court is not obligated to state reasons to support its findings, "nor is it required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id*.

{¶ 70} Here, during Nashe's sentencing hearing, the trial court made the following findings on the record:

All of these sentences will be ordered consecutively. And the Court makes the following finding:

This Court finds that consecutive sentences are necessary to protect the public from future crime. The Court finds that consecutive sentences are not disproportionate to the seriousness of the offender's conduct.

This Court finds that consecutive sentences are not disproportionate to the danger the offender poses to the public. And the Court finds that his criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 71} At the sentencing hearing, the court made no findings to support any of the R.C. 2929.14(C)(4)(a) or (b) criteria; it did however, make some findings pursuant to R.C. 2929.14(C)(4)(c). While the court did find that Nashe's "criminal conduct" demonstrated consecutive sentences were necessary to protect the public from future crime, it made no findings regarding Nashe's history of criminal conduct as required by R.C. 2929.14(C)(4)(c). By failing to make all the required statutory findings at the sentencing hearing pursuant to R.C. 2929.14(C)(4)(c), the court's imposition of consecutive sentences is contrary to law. *Philpot*, 2020-Ohio-104, at ¶ 27 (8th Dist.).

{¶ 72} Furthermore, the court's sentencing journal entry makes no reference to the incomplete findings the court made at the hearing under R.C. 2929.14(C)(4)(c). Instead, the court's sentencing journal entry states, pursuant to R.C. 2929.14(C)(4)(a), that "[Nashe] committed one or more of the multiple offenses while [he] was awaiting trial or sentencing or was under a community control or was under post-release control for a prior offense." As noted, the court

made no specific findings on the record at the sentencing hearing to support the imposition of consecutive sentences pursuant to R.C. 2929.14(C)(4)(a).

{¶ 73} Because the trial court failed to make the necessary findings at the sentencing hearing, we sustain Nashe's third assignment of error. Accordingly, we vacate Nashe's sentence and remand the matter to the trial court for resentencing for the limited purpose of considering whether consecutive sentences are appropriate under R.C. 2929.14(C)(4) and if so, to making findings on the record and issue a journal entry reflecting all the required findings.

**D. Fourth Assignment of Error — Firearm Specifications**

{¶ 74} In his fourth assignment of error, Nashe argues that the trial court committed reversible error by reading to the jury the firearm specifications contained in the indictment. By reading the firearm specification, Nashe argues that the trial court abused its discretion and showed an attitude that was unduly prejudicial. In his appellate brief however, Nashe fails to cite to or provide any case law to support his position that the trial court's conduct was improper, prejudicial, or contrary to law.

{¶ 75} An appellate court may disregard an assignment of error pursuant to App.R. 12(A)(2) if an appellant fails to cite to any legal authority in support of an argument as required by App.R.16(A)(7). *Musarra v. Cuyahoga Cty. Aud.*, 2012-Ohio-3967, ¶ 12 (8th Dist.). *See also Siemientkowski v. State Farm Ins. Co.*, 2005-Ohio-4295, ¶ 24 (8th Dist.). "'If an argument exists that can support this assigned

error, it is not this court's duty to root it out.'" *Siemientkowski* at ¶ 23, quoting *Cardone v. Cardone*, 1998 Ohio App. LEXIS 2028, *22 (9th Dist. May 6, 1998).

{¶ 76} Nashe's fourth assignment of error is overruled.

### E. Fifth Assignment of Error — Manifest Weight

{¶ 77} Nashe's fifth assignment of error argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶ 78} A manifest-weight-of-the-evidence challenge "addresses the evidence's effect of inducing belief. . . . In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 79} The reviewing court must consider all of the evidence in the record, the reasonable inferences to make from it, and the credibility of the witnesses to determine "whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must

be reversed and a new trial ordered." *State v. Stratford*, 2022-Ohio-1497, ¶ 21 (8th Dist.), citing *Thompkins* at 387.

{¶ 80} Nashe was convicted of three counts of felonious assaults in violation of R.C. 2903.11(A)(1) and (A)(2), both third-degree felonies, which state that "[n]o person shall knowingly . . . cause serious physical harm to another . . ." or knowingly "cause or attempt to cause physical harm to another . . . by means of a deadly weapon . . ." R.C. 2903.11(A)(1) and (2). Nashe was also convicted of R.C. 2923.162(A)(3), which states, [n]o person shall . . . discharge a firearm upon or over a public road or highway." R.C. 2923.162(A)(3).

{¶ 81} Nashe argues that there is not enough evidence to find him responsible for shooting the victims Chesney and Caldwell in violation of R.C. 2903.11(A)(1) and (2) and 2923.162(A)(3). Nashe points out that neither victim was able to identify him as the shooter. He cites the fact that when Chesney reviewed a photograph line-up, Chesney was unable to identify Nashe as the shooter. Nashe also asserts that the trial testimony provided by Caldwell and Chesney was not wholly consistent with their statements to the police. In particular, Nashe highlights that Caldwell specifically testified that she thought the car that was chasing them was blue, not black.

{¶ 82} Further, Nashe argues that the real-time crime camera footage does not show the fender bender both Caldwell and Chesney claim occurred, nor does it show the alleged shooting. He also notes that there was a subsequent 9-1-1 call concerning shots heard and two young males were reported fleeing the scene on foot

in the exact same area as this incident, which occurred just a few minutes before the responding officer arrived on scene. Last, Nashe argues that some of the shell casings were found on the sidewalk, as well as the roadway, which indicates they were not fired from within a vehicle.

{¶ 83} Upon our review of the entire record, we find the jury did not lose its way in convicting Nashe. There is definitive evidence via the bullet holes and in Chesney's vehicle and the shell casings found in the roadway that established he and Caldwell were shot at several times while driving. Chesney was able to identify the black vehicle that chased and shot at them, establishing that the shooter was in that vehicle. The video footage showed this black vehicle following the victims down the road. The black vehicle was then identified in the real-time crime camera video, via its license plate, as a rental car for McKinney, who testified on the stand that the car was for her son Nashe to drive. The video and still photographs from the video showed a black man with glasses wearing a backwards hat driving the vehicle with the driver's side window down, following Chesney and Caldwell. The State also put forth evidence of body-camera footage from a May 2021 motor-vehicle collision Nashe was involved in a month before this incident in which he is wearing an almost identical outfit with glasses and a backwards hat.

{¶ 84} In this case, the State's evidence consisted mostly of circumstantial evidence, since nobody actually saw Nashe use a firearm. That being said, "[p]roof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v.*

*Zadar*, 2011-Ohio-1060, ¶ 18 (8th Dist.). Circumstantial and direct evidence inherently possess the same probative value. *State v. Collins*, 2013-Ohio-488, ¶ 20 (8th Dist.). "'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.'" *State v. Hawthorne,* 2011-Ohio-6078 ¶ 9 (8th Dist.), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960).

{¶ 85} Based on the foregoing, we conclude that there was substantial circumstantial evidence presented upon which a jury could reasonably conclude beyond a reasonable doubt that Nashe committed the felonious assaults and discharged a firearm upon or over a public roadway. *State v. Monroe,* 2005-Ohio-2282, ¶ 52. As such, we overrule Nashe's fifth assignment of error.

{¶ 86} Judgment is hereby affirmed in part and vacated in part. Nashe's convictions are affirmed and his sentence is vacated. The matter is remanded to the trial court for resentencing for the limited purpose of considering whether consecutive sentences are appropriate under R.C. 2929.14(C)(4) and if so, to issue a journal entry making all the required findings.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions are vacated, and the matter remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MARY EILEEN KILBANE, P.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR

Reversible error; mistrial; improper jury communication; mandatory hearing; voir dire; allied offenses; dissimilar import; separate victims; consecutive sentences; statutory findings; R.C. 2953.08(G)(2); R.C. 2929.14(C)(4); limited remand; judgment vacated.

The jury during its deliberation was approached by the defendant's family member who communicated with a juror in front of four other jurors. The trial court properly held a hearing and conducted voir dire with the jurors. The jurors stated they were able to be fair and impartial and that this incident would not affect their judgment. As such, it was not reversible error to deny defendant's motion for a mistrial because there was no evidence defendant was prejudiced by the communication.

The trial court properly found that the felonious assault charges and the improper discharge of a firearm over a public roadway were offenses of dissimilar import since they have different victims and therefore they did not merge for sentencing.

The convictions were not against the manifest weight of the evidence as there was clearly substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt.

Last, the trial court failed to make the requisite statutory findings to satisfy the requirements of R.C. 2929.14(C)(4) to impose consecutive sentences. The case is limitedly remanded for the trial court to make the required statutory findings to support the consecutive sentences.